[28 NYS3d 18]

Paul Davis, Appellant, v Scottish Re Group Limited et al., Respondents, et al., Defendants.

First Department, March 10, 2016

## APPEARANCES OF COUNSEL

*Guzov, LLC*, New York City (*David J. Kaplan* and *Debra J. Guzov* of counsel), and *Silvia Bolatti, P.C.*, New York City (*Silvia Bolatti* of counsel), for appellant.

*Mayer Brown LLP*, New York City (*Jean Marie L. Atamian* and *James Ancone* of counsel), for Scottish Re Group Limited and Others, respondents.

*Schulte Roth & Zabel LLP*, New York City (*Howard O. Godnick* and *Andrew D. Gladstein* of counsel), for SRGL Acquisition, LDC and Another, respondents.

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Joshua S. Margolin, Jennifer J. Barrett* and *Jennifer Swearin-*

*gen* of counsel), for Massachusetts Mutual Life Insurance Co. and Others, respondents.

## OPINION OF THE COURT

Andrias, J.

Plaintiff, a resident of Mexico, holds more than 2.4 million shares (representing approximately 48%) of the noncumulative perpetual preferred shares (PPS) of defendant Scottish Re Group Limited (Scottish Re), a Cayman Islands reinsurance company. Prior to a 2011 merger, which is one of the transactions at issue, he also held more than 13 million shares (representing approximately 20%) of Scottish Re's common stock.

In this action, plaintiff asserts both direct and derivative causes of action against Scottish Re, its American operating subsidiary Scottish Re (U.S.), Inc. (SRUS), certain members of the Board of Directors of Scottish Re and SRUS (the Directors), Massachusetts Mutual Life Insurance Company (sued here as MassMutual Insurance), Cerberus Capital Management, L.P. (sued here as Cerberus Capital, LLC), and various entities affiliated with MassMutual and Cerberus (collectively, the Investors). Plaintiff alleges, inter alia, that the Directors, under the control of the Investors, directed Scottish Re to undertake an undervalued cash-out merger, in which the Investors acquired all of the outstanding common shares of Scottish Re, and a dividend strategy that benefited the Investors and unfairly prejudiced the minority shareholders.

Supreme Court granted defendants' motions, made pursuant to CPLR 3211 (a) (1), (3), (7) and (8), to dismiss the fourth, sixth, seventh, ninth and tenth causes of action for lack of standing, and to dismiss the complaint as against the Benton Street Partners defendants for lack of jurisdiction (46 Misc 3d 1206[A], 2014 NY Slip Op 51898[U]). We now modify to grant plaintiff leave to replead the fourth and sixth causes of action, to the extent authorized herein, and otherwise affirm.

In determining whether plaintiff has standing, we must first analyze the fourth and sixth causes of action to determine whether they are direct claims, as pleaded by plaintiff, or derivative claims.

Under the internal affairs doctrine, claims concerning the relationship between the corporation, its directors, and a shareholder are governed by the substantive law of the state or country of incorporation (*see Hart v General Motors Corp.*, 129

AD2d 179, 182 [1st Dept 1987], *lv denied* 70 NY2d 608 [1987]), in this case the Cayman Islands. To determine whether a claim is derivative or direct, Cayman law looks to whether the shareholder's loss is merely "a reflection of the loss suffered by the company" and "would be made good if the company had enforced its full rights against the party responsible" (*Johnson v Gore Wood & Co.*, [2002] 2 AC 1 [HL] 36 [appeal taken from Eng] [internal quotation marks omitted]). Particularly,

> "[u]nder Cayman law, shareholders may not recover 'reflective losses,' which are losses that the company itself could recover if it chose to initiate legal action. The Cayman courts have held that '[w]here a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss by the company . . . there is no discretion involved.' *Johnson v Gore Wood & Co.*, [2002] 2 A.C. 1, House of Lords. A shareholder cannot sue in a personal capacity for a loss unless that loss is distinct from that of the company, and this rule applies regardless of whether the company itself intends to sue" (*Varga v McGraw Hill Fin. Inc.*, 2015 NY Slip Op 31453[U], *28 [Sup Ct, NY County 2015]).

In the fourth cause of action, plaintiff alleges that the Directors and the Investors breached their fiduciary duties and "unfairly prejudice[d]" the minority shareholders

> "by pursuing and implementing a dividend policy, and other corporate actions, that resulted in PPS and ordinary shareholders not obtaining any dividend payments in the past, and placing shareholders in a position of not expecting to obtain significant dividend payments in the near future, while at the same time creating windfall dividends for the Investors in a manner which is clearly oppressive, unjust and inequitable, and which in essence constitutes a disguised partial liquidation of the Company."

Plaintiff seeks to recover damages to be determined at trial, which he believed to be in excess of $40,000,000.

█ The claim, as pleaded, cannot be sustained. Plaintiff's attempt to characterize the dividend policy of which he complains

as discriminatory, making the claim a direct one, contains allegations that confuse derivative and individual rights (*see Abrams v Donati*, 66 NY2d 951, 953 [1985]). The deficiencies in plaintiff's pleadings, detailed by the dissent, make it virtually impossible to discern just how the dividend policy was discriminatory and therefore affected plaintiff individually within the meaning of *Brinckerhoff v JAC Holding Corp.* (10 AD3d 520, 521 [1st Dept 2004] [holding that where some shareholders "received a lesser benefit than other shareholders" the harm was "suffered individually"]).

However, plaintiff should be given an opportunity to replead to remedy the pleading deficiencies cited by the dissent with respect to his *Brinckerhoff* claim as against the Directors only. Although a challenge to a decision to pay dividends would generally be derivative, plaintiff asserts, inter alia, that his claim is direct because the disproportionate payment of dividends is discriminatory and directly harmed him as a minority shareholder. Thus, rather than corporate mismanagement, plaintiff asserts unequal treatment in the form of an intentional, premeditated plan to pay the Investors huge windfall dividends while freezing out minority shareholders in order to induce them to sell their shares to the Investors at a steep discount.

In the sixth cause of action, plaintiff alleges that the Directors and Investors breached their fiduciary duties when they improperly forced him out of holding his ordinary shares "by unfair procedures imposed in the Merger transaction by conflicted parties who intentionally misled other minority shareholders, improperly inducing and coercing them into a misinformed and invalid vote to approve the Merger." Plaintiff alleges, inter alia, that the Directors: (i) failed to give a complete and unbiased opinion about the share price, disclose the conflicts, and pursue alternative proposals, and (ii) used the false threat that the minority would receive no compensation if the merger did not go through. Plaintiff further alleges that "[t]he Investors, having been in a position to significantly influence the conduct of the Board and the Company, breached their fiduciary duty to minority shareholders by pursuing the Merger transaction and using their influence to cause the Board to act." As to his claim for relief, plaintiff alleges that

"[t]he Company and the ordinary shareholders have been damaged by the Director Defendants' and the Investors' breaches of fiduciary duty in the Merger

in an amount to be proven at trial but believed to be in excess of $5,000,000. In the alternative, Defendants' breaches of fiduciary duty entitle the ordinary shareholders to rescission of the Merger and/or a redistribution to them of approximately one third of the Company's book value of $600 million, which was their proportionate share of the total value of the Company when the ordinary shareholders were bought out in the Merger."

This claim, as pleaded, cannot stand as it merges direct claims with derivative claims, with plaintiff alleging that the board's conduct caused harm to both himself and the company and seeking rescission of the merger as alternative relief (*see Abrams v Donati*, 66 NY2d at 953-954; *Serino v Lipper*, 123 AD3d 34, 40-41 [1st Dept 2014]). However, plaintiff should be given leave to replead to separate his direct claim of being induced by the Directors to part with his common shares in Scottish Re for less than their true value from his derivative claim alleging harm to the company (*see Shaker v Al-Bedrawi*, [2002] EWCA [Civ] 1452, [2003] Ch 350), and to set forth facts to establish the special circumstances necessary under Cayman Islands law to create a fiduciary duty between the Directors and plaintiff as a minority shareholder.

The dissent believes that leave to replead should not be granted because "the complaint gives no indication that any special circumstances exist here," and "plaintiff makes clear in his complaint that there was no such [special factual] relationship." I disagree.

Under Cayman Islands law, a director does not owe any fiduciary duties to minority shareholders solely based on his or her relationship to the company (*see Peskin v Anderson*, [2001] BCC 874, 1 BCLC 372, 2000 WL 1841707 [2000]). However, under *Peskin*,

"there may be special circumstances in which a fiduciary duty is owed by a director to a shareholder personally and in which breach of such a duty has caused loss to him directly (e.g. by being induced by a director to part with his shares in the company at an undervalue), as distinct from loss sustained by him by a diminution in the value of his shares (e.g. by reason of the misappropriation by a director of the company's assets), for which he (as distinct from the company) would not have a cause of action against the director personally.

"The fiduciary duties owed to the company arise from the legal relationship between the directors and the company directed and controlled by them. The fiduciary duties owed to the shareholders do not arise from that legal relationship. They are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case. Events may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations, such as a duty of disclosure of material facts to the shareholders, or an obligation to use confidential information and valuable commercial and financial opportunities, which have been acquired by the directors in that office, for the benefit of the shareholders, and not to prefer and promote their own interests at the expense of the shareholders" (*Peskin*, [2001] BCC at 880, 1 BCLC 372 [32]-[33]; *see also Hayat v Al-Mazeedi*, 28 Mass L Rptr 243, 2011 WL 1532109, *3-4, 2011 Mass Super LEXIS 73, *8-10 [Super Ct, Jan. 10, 2011, No. 08-1004]).

In *Peskin*, as examples of the requisite special factual relationship, the court referred to

"instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied" (*Peskin*, [2001] BCC at 880, 1 BCLC 372 [34]).

▮ Here, plaintiff has alleged, inter alia, that the merger transaction "was effected through improper misinformation and coercion so as to induce the minority shareholders into selling their shares at a severely depressed price," that the Directors "presented inaccurate and biased information to the minority shareholders to induce a favorable vote" and engaged in a "deliberate campaign of misinformation," and that the Directors "deliberately intimidated the ordinary shareholders

by repeatedly asserting that in the absence of the Merger, the ordinary shareholders would receive no compensation whatsoever for their shares" (*compare Feiner Family Trust v Xcelera.com, Inc.*, 2008 WL 5233605, \*7, 2008 US Dist LEXIS 102019, \*22-23 [SD NY, Dec. 15, 2008, No. 07-Civ-1914 (RPP)] [denying leave to file a third amended complaint because it "fail(ed) to describe any contact between (the) Plaintiffs and Defendants that could give rise to a fiduciary relationship, such as acting as Plaintiffs' agent in the context of a specific transaction, or supplying them with specific information and advice on which they relied, or failing to make disclosures of insider information in the context of a take-over"], *affd* 352 Fed Appx 461 [2d Cir 2009]). Accordingly, at the motion-to-dismiss stage, we cannot determine, as a matter of law, that plaintiff will be unable to allege the requisite special circumstances for imposition of a fiduciary duty running from directors to shareholders under Cayman law, and the breach thereof.

■ However, to the extent the fourth and sixth causes of action are predicated on the majority shareholders' alleged breach of their fiduciary duties to the minority, they lack merit since there are no such fiduciary duties under the governing law of the Cayman Islands, which undisputedly follows English law (*see Dragon Inv. Co. II LLC v Shanahan*, 49 AD3d 403, 404 [1st Dept 2008]; *Feiner Family Trust v VBI Corp.*, 2007 WL 2615448, \*7, 2007 US Dist LEXIS 66916, \*22 [SD NY, Sept. 11, 2007, No. 07-Civ-1914 (RPP)]; *see also Phillips v Manufacturers' Secs. Ltd.*, [1917] 116 LT 290, 296). Hence, leave to replead is not granted as against the Investors.

■ The derivative claims asserted in the seventh, ninth and tenth causes of action, were correctly dismissed for plaintiff's failure to comply with order 15, rule 12A of the Grand Court Rules of the Cayman Islands. The rule is applicable in the courts of this state as a substantive, rather than procedural, condition precedent to the continuation of a derivative action, as the underlying remedy is extinguished if a plaintiff fails to file an application to continue the derivative action (*see ARC Capital, LLC v Kalra*, 2013 NY Slip Op 31316[U], \*8 [Sup Ct, NY County 2013]; *see also Tanges v Heidelberg N. Am.*, 93 NY2d 48, 54 [1999]). Accordingly, the law of the forum of incorporation governs plaintiff's derivative claims (*see* 2013 NY Slip Op 31316[U], \*10), and plaintiff is barred from asserting those claims. Indeed, plaintiff does not even allege that he attempted to comply with the Grand Court Rule.

We disagree with the contrary view that the rule is unlike the condition precedent of a derivative demand merely because it contemplates a legal determination by a court rather than a business judgment by a board committee. While the Grand Court Rule involves a purely legal judgment made by the court alone, rather than a business judgment by the board, we find this to be a distinction without a difference. A derivative demand, on the one hand, and an application under the Grand Court Rule, on the other, each constitute conditions precedent to the right to bring the lawsuit. For purposes of deciding whether a derivative action may proceed, there is no meaningful legal difference between the two.

In view of this ground for dismissal, it is unnecessary to consider whether plaintiff's derivative causes of action are also barred by the English common-law proscription against derivative suits brought by individuals.

■ Finally, while it is the policy of New York courts to give effect to forum selection clauses (*see Sterling Natl. Bank v Eastern Shipping Worldwide, Inc.*, 35 AD3d 222, 222 [1st Dept 2006]), plaintiff may not enforce the forum selection clause against the Benton entities. Plaintiff is not a signatory to the merger agreement containing the forum selection clause he seeks to enforce against the Benton entities, and was at most an incidental beneficiary (*see Magdalena v Lins*, 123 AD3d 600, 600-601 [1st Dept 2014]; *ComJet Aviation Mgt. v Aviation Invs. Holdings*, 303 AD2d 272, 272 [1st Dept 2003]). Moreover, the agreement expressly negates an intent to permit enforcement by persons or entities not parties thereto (*see Specialists Entertainment, Inc. v Moore*, 115 AD3d 424, 425 [1st Dept 2014]). Nor do any of the exceptions allowing enforcement by or against a nonsignatory apply to permit him to enforce the forum selection clause (*see Freeford Ltd. v Pendleton*, 53 AD3d 32, 39 [1st Dept 2008], *lv denied* 12 NY3d 702 [2009]).

Accordingly, the order of Supreme Court, New York County (O. Peter Sherwood, J.), as amended, entered on or about October 15, 2014, which, to the extent appealed from as limited by the briefs, granted defendants' motions to dismiss the fourth, sixth, seventh, ninth and tenth causes of action for lack of standing, and to dismiss the complaint as against the Benton Street Partners defendants for lack of jurisdiction, should be modified, on the law, the facts, and in the exercise of discretion, to allow plaintiff to replead, as limited herein, the fourth and the sixth causes of action, and otherwise affirmed, without costs.

MOSKOWITZ, J. (dissenting in part). I agree with the majority's conclusion that the IAS court properly dismissed the fourth, sixth, seventh, ninth, and tenth causes of action. I also agree with the majority that the IAS court properly dismissed the complaint as against the Benton Street Partners defendants. However, I part ways with the majority on the issue of whether plaintiff should be permitted leave to replead the fourth and sixth causes of action, as the face of the complaint makes clear that plaintiff cannot plead that any of the defendants owed a fiduciary duty to him personally. Accordingly, I respectfully dissent.

The Parties

Defendant Scottish Re Group Limited (Scottish Re or the Company) is engaged in the business of reinsurance through its operating subsidiaries in the Cayman Islands, Ireland, and the United States. Scottish Re also has a United States subsidiary, defendant Scottish Re (U.S.), Inc. (SRUS).[1]

As the majority notes, plaintiff, a shareholder of Scottish Re, holds more than 2.4 million noncumulative perpetual preferred shares (PPS) of the Company and, before the merger at issue here, held over 13 million ordinary shares. Plaintiff was a substantial investor, as his 2.4 million PPS shares were almost 50% of the shares of that class when issued, and his 13 million ordinary shares were about 20% of the 68 million total.

Defendant Cerberus Capital, LLC[2] is a limited partnership organized and existing under Delaware law with its principal place of business in Manhattan. Defendant SRGL Acquisition, LDC (SRGL) is a subsidiary of Cerberus and exists under the laws of the Cayman Islands with its principal place of business in Manhattan. Defendants Benton Street Partners I, L.P. (Benton I), Benton Street Partners II, L.P. (Benton II), and Benton Street Partners III, L.P. (Benton III) (collectively, Benton), are subsidiaries of defendant MassMutual Insurance.[3] Defendant Benton I is a limited partnership organized and existing under the laws of the Cayman Islands; defendants Benton II and III

---

1. The facts are taken from the allegations in the complaint and are assumed to be true.

2. According to defendants, there is no entity named "Cerberus Capital, LLC" and they assume plaintiff meant to name "Cerberus Capital Management, L.P." as a defendant.

3. According to defendants, there is, in fact, no such entity as "MassMutual Insurance"; rather, plaintiff meant to name "Massachusetts Mutual Life Insurance Company" as a defendant. Nonetheless, I will refer to the entity as "MassMutual," the name used in the complaint.

are limited partnerships organized and existing under Delaware law.

In 2006, Scottish Re was struggling financially. However, in 2007, Benton and SRGL (collectively, the Investors) invested in Scottish Re, each eventually owning 500,000 convertible cumulative preferred participating shares (CCPPS). Under the purchase agreement, Benton's and SRGL's shares entitled them each to vote 750,000 ordinary shares, or approximately 34% of the voting shares of Scottish Re. Further, of the nine new directors of Scottish Re appointed just after issue and purchase of the CCPPS, five were managing directors or officers of the Investors, and two others had significant ties to the Investors.

In 2008, Scottish Re decided to cease originating new reinsurance business. By April of that year, the Investors caused the Company's shares to be delisted from the New York Stock Exchange so that those shares were no longer subject to the U.S. Securities and Exchange Commission's reporting requirements. This action, plaintiff alleged, eventually resulted in reduced liquidity of the Company's minority shares.

The Orkney Transaction

In 2009, certain affiliates of Cerberus (other than SRGL) bought $700 million in notes of Orkney Holdings, a subsidiary of SRUS, on the secondary market. On April 15, 2011, through privately-negotiated agreements with the noteholders, Scottish Re repurchased all the notes held by the Cerberus affiliates (the Orkney transaction). Scottish Re agreed to pay the Cerberus affiliates less for their notes, i.e., a 35% discount from par value, than it paid the unaffiliated noteholders for theirs, i.e., a 10% discount from par value.

The Orkney transaction required the approval of the disinterested members of the Scottish Re board of directors, who engaged legal counsel and financial advisors to analyze the transaction. Ultimately, those directors did, in fact, recommend to the Scottish Re board that the repurchase be approved.

The Dividend Payment

Beginning in early 2011, Scottish Re's financial health improved; thus, under the certificate of designation (COD), the document governing the PPS, the Company would have been allowed to pay dividends to the PPS holders. However, Scottish Re did not pay dividends for two years, except for once in October 2012. Plaintiff asserts that the dividend payment

merely constituted lip service to Scottish Re's obligation under the COD, and that the failure to pay dividends reflected a strategy designed to diminish or eliminate returns to the PPS holders and pressure them into selling their interests to Scottish Re at a steep discount. As a result, plaintiff asserted, the Investors effectively received over $100 million in dividends from 2011 until the commencement of this action in November 2013, while the PPS holders received only about $1 million in dividends during that period.

The Merger

In January 2011, SRGL and Benton proposed that they acquire all outstanding Scottish Re ordinary shares in a merger transaction for $0.21 per share. Accordingly, the board of Scottish Re formed a special committee of directors to review SRGL and Benton's offer; the special committee, in turn, retained legal and financial advisors, the latter of whom evaluated the offer for financial fairness. In April 2011, after negotiations, the special committee obtained a 43% increase in the offer price, from $0.21 per ordinary share to $0.30 per ordinary share. The special committee then recommended that the board of directors approve the merger.

In May 2011, the Investors announced the intended merger of newly-created nonparty SRGL Benton Ltd. with Scottish Re. The merger's stated purpose was to provide ordinary shareholders—that is, minority shareholders, or shareholders other than the Investors and their affiliates—with liquidity for their interests through payment of the merger consideration. The holders of ordinary shares of Scottish Re would receive $0.30 per share, those shares would be canceled, and the Investors would be issued new ordinary shares; the Investors would thereby have 100% of Scottish Re's voting shares.

Nonetheless, according to the allegations in the complaint, the merger was flawed and coercive from its inception, because the Investors denied the ordinary shareholders critical information and threatened them with the loss of their investment unless they approved the merger. Also, plaintiff asserted, the fairness opinion and its approval by the special committee of ostensibly disinterested board members was flawed because two of the four members of the special committee had significant yet undisclosed ties to Cerberus and MassMutual.

Notably, an information statement circulated to the ordinary shareholders before their vote to approve the merger notified them of the right to dissent from the merger share valuation

and to request that a Cayman court appraise it; a copy of the Cayman statute that provides for such right was included in that information statement. Plaintiff, in his complaint, admitted expressing his displeasure to Scottish Re's board about the merger price and the insufficient information provided to the shareholders regarding the merger and the Orkney transaction, but he explicitly chose to not invoke his appraisal right.

Benton signed the merger agreement, as did the other merger parties. The agreement contained a forum selection clause providing that each party submit to the exclusive jurisdiction of the courts of New York in any proceeding arising out of the merger agreement or the transaction. The merger agreement also barred enforcement by nonparties, stating that it "inure[d] solely to the benefit of each party hereto." Further, the merger agreement stated, "[N]othing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement other than . . . the rights of the Ordinary Shareholders to receive the Merger Consideration." The unaffiliated ordinary shareholders approved the merger agreement, and the merger closed on August 24, 2011.

Commencement of this Action

In November 2013, plaintiff commenced this action against, among others, Scottish Re, its directors, and the Investors. In the complaint, plaintiff alleged that, through their control of Scottish Re and its subsidiaries, the Investors froze out the minority ordinary shareholders of Scottish Re. Further, plaintiff alleged, the Investors pressured the PPS holders to tender their shares at a discounted price, while simultaneously implementing an oppressive dividend strategy directed at the holdout PPS holders and carrying out a partial redemption that violated the COD. Plaintiff further alleged that in the Orkney transaction, Cerberus, using its position as a controlling shareholder and advisor to Scottish Re, caused Orkney Holdings to sell the notes back to Scottish Re at a loss to Scottish Re. At the same time, plaintiff asserted, the Investors and the director defendants announced the merger, which was meant to consolidate those defendants' complete control of Scottish Re.

The complaint contained 10 causes of action. The first, second, and third causes of action asserted breach of contract claims against Scottish Re, while the fifth cause of action as-

serted a claim of tortious interference with contract against Benton, MassMutual, SRGL, and Cerberus. The fourth cause of action sought to recover for breach of fiduciary duty from the individual director defendants and from the Investors, the latter in their capacity as majority shareholders owing a duty to the minority. The sixth cause of action also sought to recover for breach of fiduciary duty from those same defendants. The seventh cause of action asserted waste against the director defendants, and the eighth cause of action asserted an aiding and abetting claim against the Investors. The ninth and tenth causes of action, both labeled derivative, asserted breaches of fiduciary duty based on the director defendants' approval of the Orkney transaction.

The Motions to Dismiss

Defendants moved separately to dismiss, among other things, the fourth, sixth, seventh, ninth and tenth causes of action. The motions were based on the derivative nature of those claims and plaintiff's lack of standing to sue derivatively. Specifically, defendants argued, derivative claims are barred under Cayman law unless the plaintiff first applies to the court and shows grounds for an exception, and plaintiff had taken neither of those actions. Further, defendants asserted, plaintiff's claims lacked merit under Cayman law, because under that law, as opposed to New York law, majority shareholders do not owe fiduciary duties to the minority.

Benton moved to dismiss on the additional ground of lack of jurisdiction, asserting that it did not have New York contacts.

The Order Appealed

The IAS court found, among other things, that the fourth and sixth causes of action were derivative, rather than direct, claims, because the harm alleged would be to Scottish Re, not to plaintiff. As to the fourth cause of action, alleging improper dividend payments, the court noted that it was characterized as improper distributions of corporate assets, reflecting a loss suffered by the corporation; the court rejected plaintiff's argument that the harm alleged was discriminatory because it was suffered by the minority. The court also found that the undervaluation of the merger share price alleged harm to the corporation, not to plaintiff.

Moreover, the court held, plaintiff lacked standing to bring any of the derivative claims, for failure to obtain, or even seek, leave of court to do so, as required by the Grand Court Rule. That rule applies to every shareholder derivative action under

Cayman law, and provides, in pertinent part, that a plaintiff must seek leave to continue the derivative action once the defendants give notice that they will oppose it:

> "(2) Where a defendant in a derivative action has given notice of intention to defend, the plaintiff must apply to the Court for leave to continue the action.
>
> "(3) The application must be supported by an affidavit verifying the facts on which the claim and the entitlement to sue on behalf of the company are based.
>
> "(4) Unless the Court otherwise orders, the application must be issued within 21 days after the [date on which defendant gave its notice of intention to defend]" (Grand Court Rules of Cayman Islands, order 15, rule 12A).

The court found that the Grand Court Rule is a substantive rule, not a procedural one, and thus applies in New York courts under conflict of laws principles and the internal affairs doctrine.

The court further found that, even if the Grand Court Rule did not warrant dismissal, dismissal was warranted for lack of standing under the English case of *Foss v Harbottle* ([1843] 67 Eng Rep 189, 2 Hare 461), which allows derivative claims only by the corporation, except in certain circumstances where individuals may bring those claims. Rejecting plaintiff's contention that the "fraud on the minority" exception applies, the court found that plaintiff had failed to plead the required element that the defendant directors had control of the corporation. Plaintiff had not alleged that the Scottish Re directors individually held a majority of the voting shares (as opposed to shares held by others, such as Cerberus and MassMutual, which allegedly held a majority of the voting shares prior to the merger). In reaching this conclusion, the court also rejected plaintiff's argument that the directors had control over a majority of the voting shares because some of the directors were nominated and employed by the majority; the court found that, under Cayman law, such nomination or employment is not deemed to give the directors the voting power of the shareholder.

Finally, the court dismissed the claims against Benton for lack of personal jurisdiction. In so doing, the court did not

mention the forum selection clause contained in the merger agreement.

Analysis

The parties agree that the issues are governed by the law of the Cayman Islands because Scottish Re is incorporated there and the internal affairs doctrine provides that claims concerning the relationship between the corporation, its directors, and a shareholder are governed by the substantive law of the state or country of incorporation (see *Hart v General Motors Corp.*, 129 AD2d 179, 182-183 [1st Dept 1987], *lv denied* 70 NY2d 608 [1987]).

Nonetheless, citing *Brinckerhoff v JAC Holding Corp.* (10 AD3d 520, 521 [1st Dept 2004]), plaintiff relies on New York law in arguing that the fourth cause of action is direct, rather than derivative, because the issuance of dividends was discriminatory. Plaintiff further contends that the claimed loss here cannot be considered "reflective" (the English and Cayman Islands case law term for a loss suffered only by the corporation and therefore derivative) because the cause of action mixes the direct loss to plaintiff individually with a loss to the corporation, and under Cayman law, a mixed claim is considered direct. According to plaintiff, a mixed claim is permitted because the "reflective" loss rule is perceived as a limitation on the plaintiff's presumptive right to sue, and the defendant has the burden of showing that the claim is reflective and should be barred.

Although this Court has noted that whether a claim is derivative or direct sometimes "is not readily apparent" (*Yudell v Gilbert*, 99 AD3d 108, 113 [1st Dept 2012]), an examination of the fourth cause of action reveals that the "unfair prejudice" part of the allegations is advanced merely as an introduction characterizing the cause of action, but is not supported by allegations of fact. Plaintiff also alleges that the PPS and minority shareholders were all denied dividends, while the Investors received windfall dividends. However, elsewhere in the complaint, where the alleged facts are more fully set forth, plaintiff first alleges that dividends were not paid to the PPS holders for a sustained period, but does not state that any other shareholders received dividends during that period so as to render the treatment of the PPS holders discriminatory.

Plaintiff further alleges that Scottish Re, through the Investors that controlled it, paid the ordinary shareholders a dividend not commensurate with the one paid to the PPS hold-

ers, but he fails to allege the contractual or other dividend rights of either group that would explain why their entitlements were required to be commensurate. Additionally, although plaintiff alleges that the Investors paid themselves over $100 million in dividends while the PPS holders received only about $1 million, he fails to set forth any nonconclusory details about those payments.

Given the allegations in the pleadings, it is unclear whether the precise harm complained of concerns (a) the dividends paid to both the ordinary shareholders and the PPS holders compared to the dividends paid to the Investors; (b) the dividends completely withheld from the PPS holders; or (c) the dividends paid to the ordinary shareholders compared to those paid to the PPS holders. Thus, as the majority agrees, we cannot glean from the complaint how the dividend policy was discriminatory and affected the plaintiff individually so that he falls under the aegis of *Brinckerhoff* (10 AD3d at 521). The alleged harm seems to have been, in general, the wrongful distribution of Scottish Re's assets, and was therefore a derivative claim, not a direct one (*see Yudell*, 99 AD3d at 114).

Further, even assuming for the sake of argument that the claim could be amended to plead a direct claim rather than a derivative one, the claim would still fail on the ground that plaintiff cannot properly plead the existence of a fiduciary duty. Under Cayman Islands law, majority shareholders do not owe fiduciary duties to the company or to minority shareholders (*see Feiner Family Trust v VBI Corp.*, 2007 WL 2615448, *7, 2007 US Dist LEXIS 66916, *22 [SD NY, Sept. 11, 2007, No. 07-Civ-1914 (RPP)]; *see also Phillips v Manufacturers' Sec. Ltd.*, [1917] 116 LT 290, 296). Likewise, a director does not, solely by virtue of his or her office, owe any fiduciary duties to minority shareholders collectively or individually (*see Peskin v Anderson*, [2001] BCC 874, 879, 1 BCLC 372 [28], 2000 WL 1841707 [2000]).

To be sure, as the majority accurately notes, there may be special circumstances under which a director owes a fiduciary duty personally to a shareholder, and under which a breach of that duty has caused loss to the shareholder directly—for example, by being induced by a director to part with his shares at an undervalue—as distinct from loss sustained by reason of a diminution in the value of his shares—for example, by reason of a director's misappropriation of the company's assets (*Hayat v Al-Mazeedi*, 28 Mass L Rptr 243, 2011 WL 1532109, *3-4,

2011 Mass Super LEXIS 73, * 8-10 [Super Ct, Jan. 10, 2011, No. 08-1004]). In the former instance, the shareholder may have a cause of action against the director personally (*id.*; *see also Peskin*, [2001] BCC at 880, 1 BCLC 372 [33] [a director may owe a fiduciary duty to a shareholder that, if breached, would permit the shareholder to bring a direct action against the directors where the shareholder "establish(ed) a special factual relationship between the directors and the shareholder ( )"]).

However, the complaint gives no indication that any special circumstances exist here. Quite to the contrary, plaintiff makes clear in his complaint that there was no such relationship between him and the directors or the Investors, stating, among other things, that the information about the challenged transactions was presented to the minority shareholders at arm's length in the form of a detailed information statement, which plaintiff states that he received. Plaintiff also alleges that far from relying on any of the director defendants' alleged omissions and misrepresentations, he wrote to the board of directors to challenge the merger and the Orkney transaction. Similarly, never does plaintiff allege that any director contacted him directly with respect to the challenged transactions (*see Feiner Family Trust*, 2007 WL 2615448, *7, 2007 US Dist LEXIS 66916, *23). In fact, never does plaintiff allege that he placed trust and confidence in the Scottish Re directors or the Investors. Accordingly, because the complaint is bereft of any suggestion that a special relationship existed—indeed, the complaint suggests that the converse was true—I disagree with the majority that plaintiff should be permitted to replead with respect to the existence of a special relationship.

As to the sixth cause of action, plaintiff repeatedly states that the cause of action is for breach of fiduciary duty "to the Company and to the shareholders." Although plaintiff alleges "prejudice" to the minority shareholders and "minority oppression," and seeks damages in his favor, the gravamen of the wrong alleged is the merger price per share suffered by all of the shareholders, not just plaintiff individually. Similarly, the alternative relief sought (rescission of the merger) bespeaks a derivative claim, not a direct one. At any rate, even assuming that plaintiff could somehow plead facts rendering the sixth cause of action direct rather than derivative, the cause of action would still suffer from the same deficiency as the fourth cause of action—namely, that there was no fiduciary duty or

special relationship between plaintiff and any of the defendants.

For the reasons set forth above, I would affirm the order to the extent appealed from as limited by the briefs.

ACOSTA and MANZANET-DANIELS, JJ., concur with ANDRIAS, J.; TOM, J.P., and MOSKOWITZ, J., dissent in part in a separate opinion by MOSKOWITZ, J.

Order, Supreme Court, New York County, as amended, entered on or about October 15, 2014, modified, on the law, the facts, and in the exercise of discretion, to allow plaintiff to replead, as limited herein, the fourth and the sixth causes of action, and otherwise affirmed, without costs.