This memorandum is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------

No. 62
Robert E. Wilson, III,
                    Respondent,
          v.
Daniel Valente Dantas, et al.
                    Appellants,
et al.,
                    Defendants.

                    Philip C. Korologos, for appellants.
                    Terrance Reed, for respondent.

MEMORANDUM:

          The order of the Appellate Division, insofar as appealed from, should be affirmed, with costs, and the certified question answered in the affirmative.  Defendants have expressly abandoned their personal jurisdiction claims in their appeal to this Court.  Their remaining claims, to the extent reviewable on this appeal, are without merit (see CPLR 3211 [a] [7]; Leon v

- 1 -

Martinez, 84 NY2d 83, 87-88 [1994]; Islamic Republic of Iran v

Pahlavi, 62 NY2d 474, 478-479 [1984], cert denied 469 US 1108

[1985]).

Wilson v Dantas

No. 62

WILSON, J.(dissenting):

We should dismiss this appeal for lack of appellate jurisdiction; the two issues as to which plaintiff sought leave to appeal have been rendered academic by plaintiff's subsequent amendment of his complaint. Defendants agree that those two issues are no longer present. However, because the majority has concluded otherwise, requiring us to reach the nonfinal arguments now raised by defendants, I address those arguments in detail. I disagree with the majority's conclusion as to the complaint's sufficiency, and would remand the *forum non conveniens* issue for redetermination.

I.

Our rules require parties requesting leave to appeal to include "[a] concise statement of the questions presented for review and why the questions presented merit review by this Court, such as that the issues are novel or of public importance, present a conflict with prior decisions of this Court, or involve a conflict among the departments of the Appellate Division. Movant shall identify the particular portions of the record where the questions sought to be reviewed are raised and preserved" (22 NYCRR 500.22). The First Department's rules similarly require

that "[t]he moving papers shall include a copy of the order of this court from which leave to appeal is requested, and shall set forth the questions of law to be reviewed by the Court of Appeals" (NY Ct Rules § 600.14).

Defendants petitioned the First Department for leave to appeal to this Court. They identified two legal questions, both concerning the sufficiency of the original complaint in pleading personal jurisdiction.[1] Within the thirty-four page memorandum urging review by this Court, there is a single boilerplate statement that "[d]efendants respectfully request leave to bring all cognizable issues before the Court of Appeals." Defendants did not mention the issues they now press on appeal.

In opposition, plaintiff argued that the Appellate Division can grant leave from non-final orders generally only "where the questions present important issues of substantial public and pressing interest," and that defendants "are limited to the questions that they have raised in their motion for leave to appeal." In reply, defendants mentioned only the two issues relating to personal jurisdiction, and did not dispute plaintiff's contention that their appeal was limited to the two

_____

[1] Defendants sought our review to address: (1) "[w]hether a reviewing court may assert personal jurisdiction over a foreign defendant solely by inferring essential jurisdictional facts that plaintiff declined to allege in his pleading is an issue deserving consideration by the Court of Appeals"; and (2) "[w]hether a cause of action arises from a business transaction for jurisdictional purposes, when that transaction is immaterial to any element of the cause of action, is an issue deserving of consideration by the Court of Appeals."

personal jurisdiction issues.

After the Appellate Division granted leave, plaintiff amended his complaint to eliminate the claimed defects in the allegations of personal jurisdiction.  Defendants thereafter conceded the mootness of the issues they pressed on us, and instead ask us to review issues they have never claimed meet the standards for review by this Court of nonfinal orders.

To justify this switcheroo, defendants cite the Appellate Division's certified question: "whether Supreme Court's order as modified by the Appellate Division was properly made." However, as we held in Quain, "if a party in its application for leave to appeal specifically limits the issues it seeks to have reviewed, it is bound by such limitation and may not raise additional issues on appeal" (Quain v Buzzetta Constr. Corp., 69 NY2d 376, 379 [1987]).  Although Quain involved a motion for leave granted by this Court and not the Appellate Division, the rule should be the same.

The justification for binding a party to its express limitation implicates questions of notice and fairness. "To permit [the party to appeal other questions not raised] necessarily disadvantages the opposing parties, who might have joined issue or even cross-moved for leave to appeal as to additional issues had adequate notice been given" (id. at 380). Here, for example, plaintiff did not cross-move or seek leave to appeal from the Appellate Division's dismissal of his third,

fifth and ninth causes of action, presumably on the understanding -- as plaintiff asserted in his opposition to the leave to appeal -- that the leave request was limited to the two personal jurisdiction questions presented by defendants as, in defendants' words, "deserving consideration by the Court of Appeals."

Unlike the United States Supreme Court, we lack (but should possess) the ability to dismiss appeals based on an improvident grant of leave to appeal. It is therefore particularly important that we avoid cases where the issues specified by the appellant as the basis for review have evaporated.

## II.

Given the Court's decision that we must decide the nonfinal issues newly raised by defendants, I conclude that, as a matter of law, only a portion of one cause of action in plaintiff's complaint[2] should survive defendants' motion.

As alleged in the complaint, plaintiff Robert E.

---

[2] Before us, procedurally, is plaintiff's original complaint, which contains nine causes of action. Because the Appellate Division affirmed the dismissal of plaintiff's third, fifth, and ninth causes of action, only six remain at present and plaintiff has, quite understandably, not asked us to review the portion of the nonfinal order of the Appellate Division dismissing those causes of action. Because the original complaint is the one before us, I refer here to the causes of action as numbered therein. (In any event, the amended complaint is not materially different from the original complaint, save for the deletion of three causes of action dismissed by the Appellate Division and a new cause of action not before us on this appeal).

Wilson, III, who was employed by Citibank in the 1990s, devised an investment strategy related to Brazil, which he persuaded Citibank to pursue.  In 1997, Citibank, Mr. Wilson and Mr. Dantas agreed to form a Cayman Islands entity, Opportunity Equity Partners, Ltd. (OEP), to be managed by Mr. Dantas in furtherance of that investment strategy.  Citibank instructed Mr. Wilson to move to Brazil to assist with management of the investment fund; he was employed in Brazil by OEP, of which he was also a 1% shareholder.  Mr. Wilson alleges that Mr. Dantas and two business enterprises formerly headed by Mr. Dantas, OEP and Opportunity Invest II, Inc. (OI), wrongfully injured him by promising and failing twice to pay him 5% of the carried interest in the private equity funds run by OEP.

Mr. Wilson claims that before leaving Citibank to become a principal and shareholder of OEP Ltd., he sent Mr. Dantas a letter in July 1997 that specified the terms of Mr. Wilson's forthcoming employment, including that he was to receive 5% of the carried interest generated by the funds.  Mr. Wilson signed the letter; no one else did.

Six months later, in December of 1997, the seven shareholders of OEP, including Mr. Wilson, entered into a Shareholders' Agreement, to which OEP and OI were also parties. At the same time, OEP, as General Partner, Citibank, N.A., as Initial Limited Partner, and International Equity Investments, Inc., as Limited Partner, entered into the Amended and Restated

Limited Partnership Agreement (LP Agreement).  Also at the same time, OEP, OI, Citibank, N.A., Banco Opportunity S.A., CVC/Opportunity Equity Partners Administradora de Recursos, Ltda., and the seven Principals of OEP, including Mr. Wilson, entered into an Operating Agreement.

The Shareholders' Agreement provided that, of OEP's 100 issued shares, OI would own 96 and Mr. Wilson and three other individuals would each own one.  The Shareholders' Agreement specifically provided: "Nothing in this Agreement shall constitute or be deemed to constitute a partnership between any of the parties hereto."  In 2005, various Citibank entities sued OEP and Mr. Dantas, who filed counterclaims.  That litigation was resolved in 2008 through a confidential settlement.  Mr. Wilson was not a party to that litigation.  He claims that Mr. Dantas falsely promised him that he would be paid his share of the carried interest out of the settlement proceeds, and that he was thereby induced to take no action with regard to the settlement, to his detriment.

Mr. Wilson initially commenced an action in federal court, seeking to recover his promised share of the carried interest, against OEP, OI, Mr. Dantas, and four Citibank entities, including International Equity Investments.  The district court dismissed the lawsuit for lack of diversity jurisdiction.  Mr. Wilson then brought this action in state court, against the same set of defendants.  Citibank removed the

case to federal court, which dismissed Mr. Wilson's claims against the Citibank entities pursuant to Fed. R. Civ. P. 12(b)(6). The federal district court declined to exercise supplemental jurisdiction over the remaining claims and remanded Mr. Wilson's claims against OEP, OI and Mr. Dantas back to Supreme Court.

Each of Mr. Wilson's causes of action, under different theories, seeks to recover the 5% share of the carried interest he claims was promised to him first in 1997, and then again in 2008, together with interest, attorneys' fees and punitive damages. Supreme Court dismissed plaintiff's claims for lack of personal jurisdiction. The Appellate Division reversed and determined that CPLR 302 (a) (1) conferred personal jurisdiction over defendants, and at the same time denied defendants' request to dismiss on *forum non conveniens* grounds, as well as their alternative grounds for dismissal. The Appellate Division also granted defendants' motion to dismiss for failure to state a claim as to three of the nine causes of action, denying it as to the other six.

III.

On a motion to dismiss for failure to state a cause of action, "[w]e accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit

within any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88 [1994]).  Here, accepting all facts alleged in the complaint as true, all but one of Mr. Wilson's claims fail as a matter of law.  Having assumed the burden of reviewing the Appellate Division's nonfinal order on a motion to dismiss under CPLR 3211 and the doctrine of *forum non conveniens*, I cannot cursorily agree that defendants' motion to dismiss is "without merit."  To consider the viability of Mr. Wilson's six remaining causes of action, I have reordered them to begin with his breach-of-contract claims.

<u>The Sixth Cause of Action</u>

The sixth cause of action alleges a breach of: (a) the 1997 Shareholders' Agreement; (b) the July 1997 purported letter agreement; and (c) an oral promise by Mr. Dantas to use proceeds from the 2008 settlement to pay Mr. Wilson his carried interest.

First, Mr. Wilson's breach of contract claims as to the Shareholders' Agreement should be dismissed as a matter of law. The contract concerns the terms of Mr. Wilson's employment in Brazil.  Its only mention of a "carried interest" is in Annex A, which contains a bullet point, "carried interest" with no further detail as to whom (among the seven Shareholders) it would be owed, how it might be calculated, when it might be paid, or any material term necessary to enforce a contractual obligation. The Shareholders' Agreement "shall be governed by and construed in accordance with the laws of the Cayman Islands", and the

Cayman courts, in interpreting this very agreement with regard to Wilson's co-employee and co-signatory, Mr. Demarco, determined: "Annex A was not complete; it was, as Mr. Dantas agreed in cross-examination, a 'to-do list.' This impression is confirmed by the fact that every party to the agreements signed by the same attorney, one Danielle Silbergleid, in New York" (Demarco v Opportunity Equity Partners Ltd., [2006] UKPC 44 ¶ 82). The Cayman high court agreed with the lower courts that the Shareholders' Agreement did not contain any enforceable terms as to carried interest, and that "As a result the shareholders' agreement was reduced in whole or in part to an agreement to agree" (id. at ¶ 83). In New York, "it is rightfully well settled in the common law of contracts . . . that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable" (Joseph Martin, Jr., Delicatessen v Schumacher, 52 NY2d 105, 109 [1981]).

That same analysis applies to Mr. Wilson's claim that he was entitled to an "irrevocable put option." Paragraph 12(3) of the Shareholders' Agreement provides: "Opportunity hereby grants to each of Wilson, Andrade, Demarco and Carvalho an irrevocable put option over their Shares in the Company at a price and according to the payment terms and conditions to be agreed pursuant to Annex A." Annex A contains merely a bare bullet point stating "Call/put upon exit", without any specification of when or how it would be implemented or how the

put price might be determined.  In the Demarco litigation, the Cayman court observed, "A shareholders' agreement prohibited the sale of shares other than to the company and gave each of the minority shareholders an irrevocable put option and the company a corresponding call option in respect of their shares, to be exercised in accordance with terms and conditions in a schedule to the agreement.  The relevant schedule was blank" (In re CVC Opportunity Equity Partners Ltd., [1999] CILR 378, 378).  The Shareholders' agreement, under either Cayman or New York law, does not contain sufficient detail for a court to determine what, if anything, the parties intended by the bare reference to a "Call/put option," and therefore no such contractual right can be enforced.

Mr. Wilson next contends that defendants' failure to disclose the terms of the 2008 Settlement Agreement was a breach of the Shareholders' Agreement.  The Shareholders' Agreement does not require the disclosure of settlements, and even if such an obligation existed, Mr. Wilson has alleged no injury from the failure to provide him the information concerning the settlement (which it is undisputed he now possesses).  The validity of his claim arising from the breach of an alleged promise to use part of the settlement to pay his share of the carried interest does not depend on any breach relating to the provision of information, especially because OEP, the General Partner, was contractually entitled to make all decisions unilaterally, except

"Important management decisions," for which it needed approval of 51% of the shareholders.  Although the Shareholders' Agreement lists "commence[ment] [of] legal proceedings" as an important management decision, it does not list settlement or termination of lawsuits as such.  In any event, because defendant International Equity Investments held 96% of OEP's shares (and Mr. Dantas another 1%), defendants had unilateral authority to enter into the 2008 Settlement regardless of whether settlement is an important management decision.  Mr. Wilson's throwaway sentence that the same conduct constituting a breach of contract also breaches the attendant covenant of good faith and fair dealing adds nothing to this cause of action.[3]

Second, the sixth cause of action contains a claim based on a letter from July 1997, signed by Wilson and conveying his proposed terms of employment.  Mr. Wilson's letter requested that Mr. Dantas countersign the letter to evidence OEP's agreement to its terms, but neither Mr. Dantas nor any representative of OEP did so.  A purported contract which is unsigned by the party against whom it is sought to be charged is unenforceable.  As we held in Joseph Martin, Jr., Delicatessen v

---

[3] "The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel" (D & L Holdings, LLC v RCG Goldman Co., 287 AD2d 65, 73 [1st Dept 2001]).  As above, there was no disclosure requirement provided for in the Shareholders' Agreement; even if the failure to disclose constituted a breach, that breach is not the cause of any damage articulated by Mr. Wilson, and, in any event, he now has the settlement agreement.

<u>Schumacher</u>, "before one may secure redress in our courts because another has failed to honor a promise, it must appear that the promisee assented to the obligation in question" (52 NY2d at 109).[4]

Moreover, six months after Mr. Wilson sent his July letter, he entered into the Shareholder Agreement, which governs the terms of his employment and status as a shareholder of OEP. The Agreement provides: "This Agreement constitutes the entire agreement between the parties hereto with respect to the matters dealt with therein and supersedes any previous agreement between the parties hereto in relation to such matters.  Each of the parties hereto hereby acknowledges that in entering into this Agreement it has not relied on any representations or warranty save as expressly set out herein or in any document referred to herein."  Under Cayman law, a contract provision allowing that the current agreement supersedes "any previous agreement" has been held as "sufficient to prevent the claimant [from] bringing any claim on a pre-contractual or collateral agreement" (<u>Re Atl. Fasions Ltd. Papanicola v Sandhu</u>, [2011] EWHC 1431 ¶¶ 36, 45-46, quoting <u>SERE Holdings Ltd. v Volkswagen Grp. UK Ltd.</u>, [2004] EWHC

---

[4] Both Mr. Wilson and defendants cite only New York law in their arguments about the enforceability of the July letter.  The July letter has no choice of law clause, and indicates that Mr. Wilson was in New York when he sent the letter.  Mr. Wilson also characterizes the promises in the letter as ones that induced him to move to Brazil.  The parties do not cite, and I have not found, any Cayman law suggesting that a written agreement may be enforced against a party who did not sign it, when the written agreement calls for signature by the party.

1551 ¶ 22).  Under New York law, even if the July 1997 letter evidenced an enforceable agreement, it would not survive the execution of the Shareholder Agreement (see e.g. Danann Realty Corp. v Harris, 5 NY2d 317 [1959]).

Third, Mr. Wilson alleges that Mr. Dantas promised him that some of the proceeds of the 2008 settlement would be used to pay Mr. Wilson his share of the carried interest.  The Shareholders' Agreement, however, expressly states: "No variation of this Agreement be valid or effective unless made by one or more instruments in writing signed by such of the parties hereto which would be affected by such variation."  Mr. Wilson's argument is that, despite the fact the Shareholder Agreement's bullet-point reference to "carried interest" is unenforceable, Mr. Dantas subsequently committed orally to pay it.  The Shareholder Agreement expressly bars that argument (Re Atl. Fasions Ltd. Papanicola v Sandhu, [2011] EWHC 1431 ¶¶ 36, 45-46, quoting SERE Holdings Ltd. v Volkswagen Grp. UK Ltd., [2004] EWHC 1551 ¶ 22).  Likewise, under New York law, "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent" (General Obligations Law § 15-301; see Eujoy Realty Corp. v Van Wagner Communications, LLC, 22 NY3d 413 [2013]).

The Seventh Cause of Action

In the seventh cause of action, Mr. Wilson alleges that Mr. Dantas, OEP and OI breached the Partnership Agreement, again claiming his entitlement to his share of the carried interest. The Partnership Agreement states that it is to be "governed by and construed in accordance with the law of the Cayman Islands"; while the Operating Agreement "shall be governed and construed in accordance with the laws of the State of New York."

Mr. Wilson is not a party to the Partnership Agreement, which is an agreement among OEP, Citibank and International Equity Investments. His breach-of-contract claim in his seventh cause of action is the following: (a) Article 6.8.1 of the Partnership Agreement requires that OEP and CVC Brasil (the original and successor General Partners, respectively) agreed to bear the cost of all compensation, fees and expenses of their employees; (b) Mr. Wilson was an employee of OEP; (c) OEP's agreement that it, not Citibank or International Equity Investments, would be responsible for the compensation of its employees, rendered all OEP employees (including Mr. Wilson) third-party beneficiaries of the Partnership Agreement; and (d) because, when the 2008 settlement agreement was signed, the General Partners failed to secure Mr. Wilson the compensation he claims he was owed, they are liable for breaches of the Partnership Agreement, as to which he is a third-party beneficiary.

As a matter of law, the fact that an agreement between two parties specifies who will be responsible for what payments does not make the recipients of the payments third-party beneficiaries with standing to sue for breaches of the agreed-upon allocation of liability between the two contracting parties. Under Cayman law, "a third party may in his own right enforce a term of the contract if (a) he is expressly identified in the contract by name, as a member of a class or as answering a particular description, which includes a person nominated or otherwise identified pursuant to the terms of the contract but the third party need not be in existence when the contract is entered into; and (b) the contract expressly provides in writing that he may" (Rights of third party to enforce contractual term., C.I. Contracts [Rights of Third Parties] Law, 2014, s. 4.). Mr. Wilson does not, and could not, allege that he falls into either category.

Furthermore, in disposing of Mr. Wilson's identical claims against the Citibank entities, the United States District Court for the Southern District of New York and the Court of Appeals for the Second Circuit both held that Mr. Wilson can assert no such claim under the Partnership Agreement or Operating Agreement (Wilson v Dantas, 2013 WL 92999 [SDNY 2013]; Wilson v Dantas, 746 F3d 530 [2d Cir 2014]). That holding collaterally estops Mr. Wilson here: his seventh cause of action here is the same claim, by the same party, against an identically situated

party, as to which Mr. Wilson had a full and fair opportunity to litigate. "The doctrine of collateral estoppel, a narrower species of res judicata, precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same" (Ryan v New York Telephone Co., 62 NY2d 494, 500 [1984]; see B. R. De Witt, Inc. v. Hall, 19 NY2d 141 [1967]). Even were Mr. Wilson not collaterally estopped, the district court and Second Circuit decisions would be persuasive precedent for concluding Mr. Wilson lacked any rights under those agreements.  Finally, even if he could sue under them, his claim depends upon the proposition that he was owed money and wrongfully deprived of it via the 2008 settlement.  Because, as discussed above, his claimed entitlement to a share of the carried interest is defective as a matter of law, this claim would vanish with it for that independent reason.

The Eighth Cause of Action

In the eighth cause of action, Mr. Wilson brings a claim under the doctrine of promissory estoppel.  "To prevail on such a cause of action, the party advancing it must demonstrate that the opposing party made a clear and unambiguous promise, upon which the former reasonably relied, to its detriment" (R. Freedman & Son v A.I. Credit Corp. 226 AD2d 1002, 1003 [1996]).  Mr. Wilson alleges that there were two promises to pay him 5% of

the carried interest: one made before he moved to Brazil and began managing the portfolio, and one made around the time of the 2008 settlement agreement negotiations.

As to the first, he alleges that he relied to his detriment by moving to Brazil and managing the portfolio, but that promise is extinguished as a matter of law by the Shareholders' Agreement containing a merger/integration clause and the unenforceable bullet point regarding carried interest. The agreement covers the same subject matter as the alleged promise (terms of employment), and by its express terms extinguishes all prior representations (see supra at 12-13). In addition, courts are reluctant to find that sophisticated business people have detrimentally relied on an agreement that was not documented (401 Hotel v MTI/Image Group, 251 AD2d 125, 126 [1st Dept 1998]). As to the second, his allegation as to detrimental reliance is completely conclusory: his "forbearance from challenging the settlement." As previously discussed, Mr. Wilson was not a party to the litigation, was not a party to the contracts at issue in that litigation, was not a third-party beneficiary of those contracts, and, if he had or has a valid claim against one or more of the parties to that settlement, the settlement could not extinguish his claim.

The Fourth Cause of Action

In the fourth cause of action, Mr. Wilson alleges claims based on the doctrines of unjust enrichment, quantum

meruit, and monies had and received.  Under each of those theories, Mr. Wilson seeks to recover the "reasonable value of his services," which he defines as his share of the carried interest.  As we have previously said, "[t]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties" (Georgia Malone & Co., Inc. v Rieder, 19 NY3d 511, 516 [2012]).  Further, "[A] party may not recover in . . . unjust enrichment where the parties have entered into a contract that governs the subject matter" (Papas v Tzolis, 20 NY3d 228, 234 [2012], quoting Cox v NAP Constr. Co., Inc., 10 NY3d 592, 607 [2008]).

The fourth cause of action is completely barred by the Shareholder Agreement, which compensates Wilson for his services (thereby setting out the parties' bargain concerning the value of Wilson's services) and contains a merger/integration clause. Other than the carried interest, Mr. Wilson does not allege that defendants failed to pay him salary, moving expenses, reimbursable business expenses, or any other compensation due him.  Thus, because the Shareholder Agreement establishes Mr. Wilson's compensation, provides no legally enforceable right to a portion of the carried interest, and contains a merger and integration clause to which Mr. Wilson agreed, his claims for unjust enrichment, quantum meruit and monies had and received fail as a matter of law.

The First Cause of Action

In the first cause of action, Mr. Wilson alleges a breach of fiduciary duty. A fiduciary duty exists "between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005], quoting Restatement [Second] of Torts § 874). This relationship is "necessarily fact-specific" and rooted in "a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions" (id.). An employment relationship, no matter how lengthy the tenure, in itself does not create a fiduciary relationship (Rather v CBS Corp., 68 AD3d 49, 55 [1st Dept 2009]).

Liberally reading the first cause of action, as we must, Wilson alleges several bases on which he claims that defendants owed him a fiduciary duty. One allegation is that OEP and Dantas, who were majority shareholders, officers and directors, owed Mr. Wilson a fiduciary duty in his capacity as a minority shareholder. That proposition is true under New York law: "Because the power to manage the affairs of a corporation is vested in the directors and majority shareholders, they are cast in the fiduciary role of 'guardians of the corporate welfare' (Leibert v Clapp, 13 NY2d 313, 317; see Case v New York Cent. R.R. Co., 15 NY2d 150, 156 [1965]). In this position of trust, they have an obligation to all shareholders to adhere to

fiduciary standards of conduct and to exercise their responsibilities in good faith when undertaking any corporate action" (Alpert v 28 Williams St. Corp., 63 NY2d 557, 568 [1984]; see also Gamble v Queens County Water Co., 123 NY 91 [1890]).

However, the Shareholders' Agreement specifies that it is to be governed by Cayman law. Even if it did not, under the internal affairs doctrine, Mr. Wilson's claims that, as a shareholder of OEP, its officers, directors and shareholders owe him a fiduciary duty would be governed by Cayman law (Davis v Scottish Re Group Ltd., 138 AD3d 230, 233-234 [2016]; Hart v General Motors Corp., 129 AD2d 179, 182 [1st Dept 1987]). Under Cayman law, a fiduciary relationship is explained as a case where "one person A holds property or exercises rights or powers for another, or for the benefit of another B. It is for that reason that A must deal with the property or exercise the rights or powers in the best interests of B and for the purposes which are properly within the scope of the power. It is for that reason that A owes a duty of loyalty to B and must not allow his duty to B to conflict with his own personal interests," meaning that "trustees, directors, solicitors and agents will all owe fiduciary duties" (McKillen v Misland (Cyprus) Investments Ltd., [2012] EWHC 521, at ¶ 94, 97). However, "a case that the shareholders owe each other fiduciary duties is not sustainable" (id., at ¶ 94; Davis, 138 at 238). The Shareholder Agreement provides, "Nothing in this agreement shall constitute or be

deemed to constitute a partnership between any of the parties hereto and none of them shall have any authority to bind the others in any way."  A clause in a shareholder agreement saying that nothing in the agreement should be read to create any partnership between the parties is a "strong indicat[or]" that there was in fact, no such relationship of fiduciary duty (id. at ¶ 97).

The Demarco case, cited by defendants for the proposition that Cayman law recognizes a fiduciary relationship arising from a quasi-partnership only in the context of a winding-up transaction, addresses at most Wilson's alternative ground for the existence of a fiduciary relationship (quasi-partnership), not his minority shareholder ground.  To the extent his first cause of action seeks to recover the carried interest on a claimed fiduciary duty among shareholders or partners, that recovery is barred by the Shareholder Agreement and Cayman law, as above.

However, to the extent the first cause of action seeks to recover payments owed to Mr. Wilson arising from his status as an OEP shareholder, predicated on a theory that defendants, as directors and officers of OEP treated him unfavorably when compared to other shareholders (namely, Mr. Dantas and International Equity Investors), the allegations in his first cause of action are pleaded sufficiently to state that claim

under either Cayman or New York law.[5]  In particular, the allegation, "reaching a Settlement Agreement that excluded Plaintiff from knowledge of its terms and from participation in the distribution of proceeds, and by thereafter failing to distribute to Plaintiff his interest in the subsequent proceeds of the divestment" can be fairly read to allege that Wilson was deprived of the fair value of his 1% ownership share via the 2008 settlement and/or through other acts of defendants, while the other OEP shareholders were treated better.  Under Cayman law, in order for a director to owe a fiduciary duty to a shareholder, special factual circumstances must arise in which a director has caused a loss to a shareholder personally (Peskin v Anderson, [2001] BCC 874, 1 BCLC 372, 2000 WL 1841707 [2000]).  This might occur in an instance where a director "direct[ly] approaches" and "deal[s] with, the shareholders in relation to a specific transaction . . . holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them . . . or supplying them with specific information and advice on which they have relied" (id.).  This is distinct from the case in which the shareholder suffers a loss of value to his shares based on a director's action as a director of the company (id.).  Here, Mr. Wilson's allegations are sufficient to meet the special circumstances requirement, in

---

[5] That claim should be interpreted under Cayman law, because Wilson's rights as a shareholder arise from the Shareholder Agreement, which chooses Cayman law, and because OEP is a Cayman corporation.

that Mr. Dantas told Mr. Wilson that he would represent his interests in the settlement negotiations, but that in the end he was excluded from them, while other shareholders were treated more favorably.

### The Second Cause of Action

Finally, in the second cause of action, Mr. Wilson alleges that defendants engaged in constructive fraud and fraudulent concealment when they failed to disclose the terms of the 2008 Settlement. Constructive fraud requires that "(1) a representation was made, (2) the representation dealt with a material fact, (3) the representation was false, (4) the representation was made with the intent to make the other party rely upon it, (5) the other party did, in fact, rely on the representation without knowledge of its falsity, (6) injury resulted and (7) the parties are in a fiduciary or confidential relationship" (Del Vecchio v Nassau Co., 118 AD2d 615, 617-618 [2d Dept 1986]). Mr. Wilson's second cause of action seeks damages from defendants on the theory that defendants fraudulently concealed the 2008 Settlement from Mr. Wilson, depriving him of the right to participate in the negotiations and/or know the terms so he could take some sort of unspecified action to block it. As discussed previously, Mr. Wilson had no claim that was settled or extinguished through the 2008 settlement, and was not a party to that litigation. Although he is a shareholder of OEP, and OEP settled its claims and claims

against it, a minority shareholder does not have any legal right to participate in settlement negotiations or, absent circumstances not alleged here, block the officers and directors (or majority shareholders) from settling litigation brought by or against the company; those decisions are entrusted to the company and insulated by the business judgment rule.

To plead a claim for fraudulent concealment, "plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentations" (ACA Fin. Guar. Corp. v Goldman, Sachs & Co. 25 NY3d 1043, 1044 [2015]). A claim of "fraudulent concealment requires, in addition to the four foregoing elements [of fraudulent misrepresentation], an allegation that the defendant had a duty to disclose material information and that it failed to do so" (P.T. Bank Cent. Asia, N.Y. Branch v ABN AMRO Bank N.V., 301 AD2d 373, 376 [1st Dept 2003). Mr. Wilson's fraudulent concealment claim fails for the additional reasons that defendants had no duty to disclose the settlement negotiations to Mr. Wilson, and given the merger, integration and written modification provisions of the Shareholder Agreement signed by Mr. Wilson, he could not have justifiably relied on an oral agreement with Mr. Dantas.

Absent a duty to disclose before signing the settlement (which defendants did not have), Wilson does not state a claim for constructive fraud or fraudulent concealment; the allegations here as to discrimination against minority shareholders are

subsumed within his first cause of action.[6]

IV.

The Appellate Division denied defendants' motion to dismiss on grounds of *forum non conveniens*. *Forum non conveniens* is discretionary and based on a variety of factors. I would vacate the Appellate Division's decision and remand for a redetermination for two reasons: (1) the *forum non conveniens* calculus would likely be affected by the dismissal of most of Mr. Wilson's claims; (2) the Appellate Division's consideration of the unavailability of a jury trial in the Cayman Islands is an error of law; adequacy of the alternative forum does not consider whether a jury trial is available, but only the fairness and legitimacy of the process (<u>Islamic Republic of Iran v. Pahlavi</u>, 62 NY2d 474, 481 [1984] ["the availability of another suitable forum is a most important factor to be considered in ruling on a motion to dismiss"]). Courts must take great care in assessing the adequacy of a foreign forum, not to impugn foreign judicial systems merely because they are different. It is common, in many jurisdictions, for civil cases not to warrant the availability of a jury (<u>Piper Aircraft Co. v Reyno</u>, 454 US 235, 252, n 18 [1981] ["jury trials are almost always available in the United States, while they are never provided in civil law jurisdictions. Even in

---

[6] Mr. Wilson's amended complaint includes a new cause of action, seeking an equitable accounting. Because the appeal before us is taken from the original complaint, which did not include that claim; even under the majority's holding, we lack jurisdiction to consider it here.

the United Kingdom, most civil actions are not tried before a
jury"]; <u>Lockman Found. v Evangelical All. Mission</u>, 930 F2d 764,
768 [9th Cir 1991] [the lack of a right to a jury trial in Japan
did not render Japan an inadequate forum]).  Furthermore, under
New York law, Mr. Wilson has waived "his right to a jury trial by
joining legal and equitable claims" (<u>Horizon Asset Mgmt., LLC v
Duffy</u>, 106 AD3d 594, 594-595 [1st Dept 2013]).

Accordingly, I respectfully dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order, insofar as appealed from, affirmed, with costs, and
certified question answered in the affirmative, in a memorandum.
Chief Judge DiFiore and Judges Rivera, Stein and Fahey concur.
Judge Wilson dissents in an opinion.  Judge Garcia took no part.

Decided June 6, 2017