[Cite as *State v. O'Malley*, 2021-Ohio-2038.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT**
**COUNTY OF CUYAHOGA**

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 109454 |
| v. | : | |
| CHRISTOPHER J. O'MALLEY, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 17, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-639114-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Allison M. Cupach, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Noelle A. Powell, Assistant Public Defender, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Christopher J. O'Malley ("O'Malley") appeals his conviction for having weapons while under disability. For the reasons that follow, we affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

{¶ 2} On May 16, 2020, a Cuyahoga County Grand Jury returned a two-count indictment against O'Malley, charging him on Count 1 with grand theft in violation of R.C. 2913.02(A)(1) and on Count 2 with having weapons while under disability in violation of R.C. 2923.13(A)(3). Both are third-degree felonies. O'Malley elected to try Count 1, the grand theft charge in violation of R.C. 2913.02(A)(1) to a jury. As to Count 2, having weapons while under disability in violation of R.C. 2923.13(A)(3), O'Malley waived his right to a jury and elected to try Count 2 to the bench.

{¶ 3} These charges arose from a missing firearm, owned by the victim Tiffany Holstein ("Holstein"), that allegedly went missing from her home after her birthday celebration on November 24, 2018. As of November 2018, Holstein was living with her boyfriend Robert Higgins ("Higgins"), at 4529 West 130th Street in Cleveland, a home owned by Higgins's uncle, who lived in the basement. She had been living there for four to five months at that time. Higgins's cousin "Fluffy," whose real name is unknown to Holstein, and his friend "Dalton" also lived in the house. The home had three bedrooms upstairs and one on the main floor, in addition to the living quarters in the basement. There was only one stairway to the second floor, which was opposite the front door of the home.

{¶ 4} Holstein testified that she and Higgins shared a bedroom on the second floor, which they kept padlocked unless one of them was home. The couple shared a pitbull that was kept in the bedroom when they were not home as well.

Holstein also kept two firearms in her bedroom, a semiautomatic .22 caliber handgun and a 9 mm Hi-Point. Holstein testified that both firearms were loaded at all times. Holstein testified she kept the .22 caliber firearm out most of the time, either next to her or with her. When she was not home, she kept the .22 caliber firearm in her bedroom closet on the top shelf behind other objects. She kept the 9 mm firearm on the side table next to her bed under coloring books.

{¶ 5} On November 24, 2018, the day before Holstein's birthday, she, Higgins, Holstein's cousin Brandon Williamson ("Williamson"), and O'Malley gathered at their house before they went downtown to celebrate. Holstein testified that she had met O'Malley through Williamson and considered him a friend. Higgins also considered him a friend. O'Malley and Holstein would see each other a few times a week, sometimes at Holstein's house. She testified that O'Malley was familiar with her firearms.

{¶ 6} That night, before the party, Holstein had covered her 9 mm firearm with coloring books in its usual spot on top of her bedside table. Once people arrived but before they all went downtown that night, O'Malley put his belongings, which included a duffel bag, in Holstein's room for safekeeping. While O'Malley was in the room with her, she placed the .22 caliber firearm up in her closet where she normally stored it and closed the closet door.

{¶ 7} The group left the house to go downtown at 10:00 or 11:00 p.m. and returned to the home at about 2:00 a.m. At some point during the evening, Holstein and O'Malley got into an argument. When they got back to the house, the argument

escalated to the point where Holstein punched O'Malley in the face. Holstein then went upstairs and unlocked her bedroom door to let her dog out while everyone was downstairs. She eventually brought the dog back upstairs, shut her door, and went back downstairs without locking her door. Holstein and O'Malley continued to argue in the living room with Higgins, while Williamson was asleep on the couch. Fluffy was in his room upstairs and Higgins's uncle was in the basement. Holstein was unsure if Dalton was in his room.

{¶ 8} At some point during the argument, O'Malley abruptly went upstairs to retrieve his belongings and left the house when his mother arrived. Holstein felt the way he left was suspicious, so after O'Malley departed, she went to her room, where she noticed the closet door was open. Holstein could not remember if she had opened it since being home, but she knew she had closed it before they went out. She checked on her .22 caliber firearm and when she could not find it, she immediately suspected O'Malley stole it. Higgins testified that he called O'Malley and asked O'Malley if he had it, and O'Malley denied having the firearm. Holstein and Higgins then looked for the firearm but were unable to find it. Holstein called the police to report it missing and told the police O'Malley had taken it. The next day, Higgins found the "missing" .22 caliber firearm underneath a glass table at the bottom of the stairs by the front door.

**{¶ 9}** It was not until one week later, on November 30, 2018, that Holstein noticed her 9 mm firearm was missing from the table next to her bed.[1] The coloring books were undisturbed, so it was not until Holstein was looking for her 9 mm firearm to go to the shooting range that she noticed it was not there. She searched the house for the firearm for a day before contacting the police about this second missing firearm on December 1, 2018. The following day, Officer Wise from the Cleveland Police Department responded to her call. Holstein told Officer Wise that she believed O'Malley took the 9 mm firearm.

**{¶ 10}** Holstein then testified that on December 27, 2018, she received Facebook messages from O'Malley. They often communicated through Facebook's Messenger application. Holstein claimed to have taken screenshots of the messages between her and O'Malley that occurred on December 27th, 28th, and 31st as well as an additional message from March 7, 2019. She provided these screenshots to Detective Holt, from the Cleveland Police Department's First District, who was assigned to her case on February 21, 2019. At trial, the state had the screenshots admitted into evidence as state's exhibit No. 4.

**{¶ 11}** Throughout the messages, O'Malley apologizes and vaguely references an "it" that he should not have touched, that he was going to bring "it" back the next day, but "it" was stolen from him that night and sold before he could.

---

[1] Holstein was unable to remember the number of days that passed between her birthday celebration, when she noticed her 9 mm firearm missing, and when the officer arrived, but said it could have been at least a week before she noticed. Higgins testified it was just a couple days later that she noticed. Officer Wise's testimony, which is based on his report, is the only evidence of specific dates for these events.

He then offers to buy her a new "it." Throughout the conversation, O'Malley refers to a few specific events from the evening of November 24, 2018, such as his argument with Holstein, her punching him, and how his mother picked him up. In one message on December 27, 2018, he mentions a "hy point [sic]," and on the December 28, 2018, he states his mom has the $200.00 he wants to give Holstein to buy a new one, but he would "really like to just get [Holstein] the gun instead." O'Malley even mentions getting her a firearm that does not jam, as Holstein testified her Hi-Point would jam on occasion. On March 7, 2019, O'Malley messaged Holstein again through Facebook Messenger and this time, rather than reply with a message, Holstein testified that she called him through Facebook Messenger and they discussed the missing 9 mm firearm over the phone. Holstein testifies that O'Malley offered again to pay for a new firearm, but she told him she just wanted her firearm back.

{¶ 12} The defense only called one witness, Dana Driver ("Driver"), who testified that, while not currently dating, she and O'Malley had been dating on and off for years. In November 2018, they were dating, although they were not on the best of terms. Driver testified that she suspected Holstein and O'Malley were romantically involved. Looking to upend this potential relationship, she testified that she began messaging Holstein in late December 2018, posing as O'Malley through his Facebook Messenger account. Driver testified that O'Malley's phone was not password protected, so she could easily message Holstein through his phone without his knowledge on his Facebook account.

{¶ 13} Driver testified that she messaged Holstein through O'Malley's account, posing as him, to tell Holstein that O'Malley stole her firearm. She stated she was aware of Holstein's accusation of the missing firearm through reading their prior messages. Driver testified that she messaged Holstein, as O'Malley, saying whatever she thought would make Holstein angry with O'Malley, based on what she could glean from their prior messages. The details provided in the messages, according to Driver, were all things Driver made up based on what she knew about what happened on November 24, 2018, from O'Malley, mutual friends, and O'Malley's mother.

{¶ 14} Driver testified that she broke up with O'Malley in February 2019 because she was still convinced he was romantically involved with Holstein. Because of this separation, she was unaware O'Malley was being prosecuted for allegedly stealing Holstein's firearm. She testified that once she found out he was being prosecuted, she decided to come forward, two months before trial, to admit to falsely messaging Holstein through O'Malley's account. To that end, she met with both defense counsel and the assistant county prosecutor at a pretrial hearing to discuss her testimony.

{¶ 15} The jury trial on Count 1 commenced on November 18, 2019, and on November 21, 2019, the jury reached a not guilty verdict on the grand theft charge. That same day, having heard the same evidence as the jury, the trial court found O'Malley guilty on Count 2 for having weapons while under disability. On November 24, 2019, following this conviction, O'Malley filed a motion after verdict for

judgment of acquittal, which the trial court denied on January 7, 2020. That same day, the trial court sentenced O'Malley to two years of community control with a 36-month suspended prison sentence and ordered O'Malley to pay $200.00 in restitution to Holstein for the firearm. O'Malley timely appealed the January 7, 2020 judgment entry.

{¶ 16} This appeal follows. O'Malley asserts the following four assignments of error:

## Assignments of Error

I. There is insufficient evidence to support O'Malley's conviction for having a Weapon under disability.

II. O'Malley's conviction for having a Weapon under disability was against the manifest weight of the evidence.

III. O'Malley's conviction for having a Weapon under disability violates the doctrine of collateral estoppel and violates his rights under the 5th and 14th amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

IV. Because the jury acquitted O'Malley of stealing Holstein's gun, the trial court's order of restitution is contrary to law.

## LAW AND ANALYSIS

{¶ 17} O'Malley's first and second assignments of error allege his conviction by the trial court for having a weapon under disability in violation of R.C. 2923.13 was supported by insufficient evidence and was against the manifest weight of the evidence. As both assignments of error deal with the evidence produced at trial, they will be dealt with together. While it is not clear in the record which firearm O'Malley's conviction was based on, upon review we find that there is sufficient

evidence to sustain O'Malley's conviction on his possession of either firearm and it is not against the manifest weight of the evidence.

{¶ 18} "An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Rogers*, 178 Ohio App.3d 332, 2008-Ohio-4867, 897 N.E.2d 1171, ¶ 41 (8th Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict, is a question of law." *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 19} "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Bowden,* 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12, citing *Jenks* at paragraph two of the syllabus. "'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." *Cleveland v. Watson*, 8th Dist. Cuyahoga No. 108746, 2020-Ohio-3284, ¶ 30, quoting R.C. 2901.05(E).

{¶ 20} While the test for sufficiency requires a determination of whether the prosecution has met its burden of production at trial, a manifest weight challenge questions whether the prosecution has met its burden of persuasion. *State v.*

*Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12-13, citing *Thompkins* at 390.

{¶ 21} In assessing whether a conviction is against the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, and consider the witnesses' credibility. *Gerston v. Parma VTA, L.L.C.*, 8th Dist. Cuyahoga No. 105572, 2018-Ohio-2185, ¶ 58. There is a presumption that the factfinder's determinations are correct unless we find that the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered." *Illum. Co. v. Bosemann*, 2020-Ohio-3663, 154 N.E.3d 1205, ¶ 28 (8th Dist.), quoting *Gerston* at ¶ 58-59. This is presumed because the trier of fact had the opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Gerston* at ¶ 59, quoting *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 22} "A verdict supported by some competent, credible evidence going to all the essential elements of the case must not be reversed as being against the manifest weight of the evidence." *Gerston* at ¶ 57, citing *Domaradzki v. Sliwinski*, 8th Dist. Cuyahoga No. 94975, 2011-Ohio-2259, ¶ 6; C.*E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. A conviction should be reversed only in the most "exceptional case in which the evidence weighs heavily against the conviction." *State v. Philpott*, 8th Dist. Cuyahoga Nos. 109173, 109174, and 109175, 2020-Ohio-5267, ¶ 77, quoting *Thompkins* at 388.

{¶ 23} O'Malley was convicted by the trial court of having weapons while under disability in violation of R.C. 2923.13(A)(3), which provides in relevant part:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * *
>
> (3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

Because O'Malley stipulated to having a prior felony conviction at trial, the state had to present evidence to prove beyond a reasonable doubt that O'Malley knowingly acquired, had, carried, or used a firearm to sustain a conviction for having a weapon while under disability. R.C. 2923.13. Although the statute does not list possession as an element, the state is required to prove that O'Malley knowingly had a firearm. *State v. Body*, 8th Dist. Cuyahoga No. 109388, 2021-Ohio-703, ¶ 29. To "have" a weapon under disability requires either actual or constructive possession. *Id.* Therefore, the state had to put forth evidence to establish, beyond a reasonable doubt, that at some point, O'Malley had either actual or constructive possession of a firearm.

{¶ 24} "Actual possession entails ownership or physical control, whereas constructive possession is defined as knowingly exercising dominion and control over an object, even though that object may not be within one's immediate physical possession." *State v. Chandler*, 8th Dist. Cuyahoga Nos. 93664 and 93665, 2011-Ohio-590, ¶ 55, citing *State v. Hankerson*, 70 Ohio St.2d 87, 91, 434 N.E.2d 1362

(1982). An individual's mere presence in an area where a firearm is located (or was located) does not conclusively establish constructive possession; however, this presence, "coupled with another factor probative of dominion or control over the contraband, may establish constructive possession." *State v. Body*, 8th Dist. Cuyahoga No. 109388, 2021-Ohio-703, ¶ 39, quoting *State v. Cooper*, 3d Dist. Marion No. 9-06-49, 2007-Ohio-4937, ¶ 26.

{¶ 25} Ohio courts have "long held that circumstantial evidence is sufficient to sustain a conviction if the evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 75, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). Circumstantial evidence is proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow. *Body* at ¶ 31, citing *State v. Beynum*, 8th Dist. Cuyahoga No. 69206, 1996 Ohio App. LEXIS 2143 (May 23, 1996).

{¶ 26} Holstein's testimony establishes where the firearms were located before going out for her birthday and how at least one was noticeably relocated that evening after O'Malley was in her bedroom. The firearms had two locations in which they were individually kept, the .22 caliber firearm in her closet and the 9 mm firearm next to her bed under coloring books. Holstein testified she was certain she had put the .22 caliber firearm back in the closet and shut the closet door before leaving to go out drinking that evening. She testified O'Malley was in the room when

she did that. Then, when she went upstairs after O'Malley had left, she saw the closet door open and the firearm missing. The .22 caliber firearm was then found under the glass table at the bottom of the stairs right next to the front door. Simply put, her testimony regarding to the .22 caliber firearm establishes where the gun was last seen, who was last alone with it, and that someone moved it from its regular spot to a place it is never kept.

{¶ 27} For our sufficiency analysis, the relevant inquiry is if the state's evidence through Holstein's testimony is believed, could any rational trier of fact have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Philpott*, 8th Dist. Cuyahoga Nos. 109173, 109174, and 109175, 2020-Ohio-5267, ¶ 38, citing *Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). For the .22 caliber firearm, the testimony of Holstein, if believed provides ample opportunity for the trier of fact to infer that the only person who had the opportunity to move the .22 caliber firearm was O'Malley, and the only way he could do so would be to take actual possession of the .22 caliber firearm and move it downstairs. Believing the state's evidence, any rational trier of fact could have found sufficient evidence beyond a reasonable doubt that O'Malley must have possessed the .22 caliber firearm, the only element the state was required to prove in this case. *Id.*

{¶ 28} Next, we review the state's evidence regarding the 9 mm firearm, which mainly consisted of Holstein's testimony and the Facebook messages between her and O'Malley. Holstein testified that she did not notice her 9 mm firearm was missing for almost a week because it is usually kept concealed by coloring books on

her bedside table. She went to retrieve the 9 mm firearm to go to the shooting range and it was not in its usual location. She testified that she called the police and told them no one else had been in her and Higgins's room besides O'Malley.

{¶ 29} Then, Holstein presented screenshots of Facebook messages between her and O'Malley on three separate days, two in December 2018 and one in March 2019, to the police. She testified as to the authenticity of the messages, which document O'Malley apologizing for touching "it" and claiming that he was going to bring "it" back the next day, but "it" was stolen from him that night and sold before he could. Besides apologizing, O'Malley also offered Holstein $200.00 to make up for losing "it," and at one point even directly refers to a "hy point [sic]," the brand of Holstein's missing 9 mm firearm. It is also worth noting that in these messages, O'Malley referenced specific incidents from the evening of the birthday celebration, like his argument with Holstein and the fact that she punched him. Holstein then testified that when he messaged her on March 7, 2019, she called him and they discussed the missing 9 mm firearm.

{¶ 30} For our sufficiency analysis regarding the 9 mm firearm, the state's evidence shows the firearm was in her bedroom before the birthday celebration and was found missing from her bedroom one week later. The evidence showed no one else was alone in the room with the firearm in the interim besides O'Malley. The state also presented O'Malley's own statements through Facebook messages, where he repeatedly and profusely apologized to Holstein for touching "it," losing "it" and not being able to return "it" and even offers her money for a new "it." This evidence,

if believed, is sufficient for any reasonable trier of fact to find the state proved O'Malley possessed the 9 mm firearm.

{¶ 31} As for our manifest weight analysis, we must examine the entire record, including the only witness called by O'Malley, his former girlfriend, Dana Driver. Driver testified that the Facebook messages to Holstein from O'Malley's account were actually written and sent by her without his knowledge. She testified as to both why and how she sent the messages. She also explained why she did not come forward sooner to explain the messages for O'Malley. However, upon weighing the entire record, we cannot say the trial court clearly lost its way nor created a manifest miscarriage of justice with its conviction in this case. There is enough evidence in the record from both Holstein's testimony and the Facebook messages exchanged between Holstein and O'Malley to find O'Malley's possession of either the .22 caliber firearm or the 9 mm firearm. This is not an exceptional case in which the evidence heavily weighs against the conviction. *Philpott*, 8th Dist. Cuyahoga Nos. 109173, 109174, and 109175, 2020-Ohio-5267, ¶ 77, quoting *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541 (1997). Based on the foregoing, O'Malley's first and second assignments of error are overruled.

{¶ 32} O'Malley's third assignment of error alleges his conviction for having a weapon while under disability violates the doctrine of collateral estoppel and his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution. O'Malley's basis for this argument is that because the jury acquitted him of grand theft of Holstein's

firearm, the trial court cannot convict him of having weapons while under disability. He argues he could not have possessed the firearm, to satisfy the elements of having weapons while under disability because the jury's acquittal on the grand theft charge means he did not steal the firearm.

{¶ 33} This court has dealt with this argument before. In *State v. Eason*, 2016-Ohio-5516, 69 N.E.3d 1202, ¶ 67 (8th Dist.), the defendant was charged with drug trafficking, drug possession, possessing criminal tools, carrying concealed weapons, having weapons while under disability, and improperly handling firearms in a motor vehicle. Just like O'Malley, the weapons while under disability charge was tried to the court and the jury considered the rest of Eason's charges. The jury acquitted the defendant of all counts, while the trial court found Eason guilty of having weapons while under disability. This court affirmed the conviction by the trial court, holding that:

> [c]onsistency between verdicts on several counts of a criminal indictment is unnecessary, and where the defendant is convicted on one or some counts and acquitted on others the conviction will generally be upheld, irrespective of its rational incompatibility with the acquittal.

*Eason* at *id.*, citing *State v. Woodson*, 24 Ohio App.3d 143, 493 N.E.2d 1018 (10th Dist.1985). This court found double jeopardy and collateral estoppel did not apply to the case of inconsistent verdicts where the inconsistent responses are to different counts. *Id.* at ¶ 27, citing *State v. Lovejoy*, 79 Ohio St.3d 440, 683 N.E.2d 1112 (1997), paragraph two of the syllabus. "Each count of a multi-count indictment is

deemed distinct and independent of all other counts, and thus inconsistent verdicts on different counts do not justify overturning a verdict of guilt." *Id.* at ¶ 68.

{¶ 34} This court held similarly in *State v. Callahan*, where the defendant again was acquitted by a jury of charges such as murder, felonious assault, discharge of a firearm on or near prohibited premises, and improperly discharging a firearm at or into a habitation, but was convicted in a bench trial of two charges of having weapons while under disability. *State v. Callahan*, 8th Dist. Cuyahoga No. 106445, 2018-Ohio-3590, ¶ 29. Callahan argued his conviction was barred by the doctrine of collateral estoppel because the jury acquitted him of all the weapons-related charges, so there was no evidence for the judge to have found he illegally possessed a firearm. *Id.* at ¶ 19.

{¶ 35} In the instant case, the trial court's conviction for having weapons while under disability is a separate and distinct count, which is independent of the grand theft count. The fact that the conviction is inconsistent with the jury's acquittal of the grand theft count does not bar the conviction by collateral estoppel. Accordingly, we overrule O'Malley's third assignment of error.

{¶ 36} O'Malley's fourth and final assignment of error argues that the trial court's restitution order of $200.00 is contrary to law. O'Malley argues that the victim's economic loss is not a direct and proximate result of the commission of the offense since he was acquitted of the grand theft charge for the firearm. We disagree.

{¶ 37} We review of a trial court's order of restitution for an abuse of discretion. *State v. Maurer*, 2016-Ohio-1380, 63 N.E.3d 534, ¶ 12 (8th Dist.). "R.C.

2929.18(A)(1) allows a court to impose an order of restitution to crime victims as part of a criminal sentence." *State v. Kibble*, 2017-Ohio-12, 80 N.E.3d 1066, ¶ 25 (8th Dist.). "Generally, restitution is limited to the actual economic loss suffered by the victim that is the direct and proximate result of the crime for which a defendant was charged and convicted." *Id.*, citing *State v. Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, ¶ 22-24. "A trial court is required to conduct a hearing on restitution only if the offender, victim, or survivor disputes the amount of restitution ordered." *Kibble* at ¶ 31, quoting *Lalain* at ¶ 27.

{¶ 38} The trial court convicted O'Malley of having weapons while under disability in violation of R.C. 2923.13(A)(3), which means the court found that he knowingly acquired, had, carried, or used Holstein's firearm. Therefore, as a direct and proximate result of O'Malley's possession of Holstein's firearm, Holstein suffered economic loss in the form of the dispossession of her 9 mm firearm. Because neither O'Malley nor Holstein objected to the restitution amount at the sentencing hearing, the trial court was not required to conduct a hearing on the amount. Further, $200.00 was the amount of money that O'Malley offered to pay Holstein in the Facebook messages to buy a new 9 mm firearm.

{¶ 39} Based on the foregoing, we find the trial court's order for restitution is not contrary to law because the economic loss suffered by the victim is the proximate result of the crime for which O'Malley was convicted, namely the possession of her 9 mm firearm. Therefore, we overrule O'Malley's fourth assignment of error.

**{¶ 40}** The judgment of the trial court is hereby affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

SEAN C. GALLAGHER, P.J., and
EMANUELLA D. GROVES, J., CONCUR