The STATE of Ohio, Appellee,

v.

WILLIAMS, Appellant.

[Cite as *State v. Williams* (1991), 75 Ohio App.3d 293.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 58854.

Decided July 29, 1991.

*Kevin P. Weiler,* Broadview Heights Prosecutor, for appellee.

*Hyman Friedman,* County Public Defender, and *Donald Green,* Assistant Public Defender, for appellant.

HARPER, Judge.

## I

Appellant, Linda Williams, was charged by the city of Broadview Heights with one count of gross patient neglect, in violation of R.C. 2903.34(A)(3), and one count of unlawful restraint, in violation of R.C. 2905.03. A codefendant, Idelia Trapp, was charged with the same offenses.

On October 13, 1989, a bench trial was held which lasted for several days. At the close of the prosecution's case, appellant moved pursuant to Crim.R. 29 to dismiss. Appellant's motion was denied.

On October 20, 1989, appellant was found guilty of unlawful restraint and not guilty of gross patient neglect. Codefendant Idelia Trapp was found not guilty of the charges against her.

On October 26, 1989, appellant was sentenced to sixty days in jail with fifty-nine days suspended. She was also fined $500 plus court costs. The court suspended $300 of the fine. She was placed on a one-year probation, which

required her to report for two months. This cause is before this court on appeal as of right. For the reasons to follow, we reverse.

## II

Linda Williams and Idelia Trapp were employees of Broadview Developmental Center ("center"). Both were employed as hospital aides. They were placed in charge of Cottage 289, which housed nine mentally and physically handicapped females whose ages ranged from twenty to thirty years.

Gary Kozich, the Quality Assurance Coordinator, testified that on May 6, 1989, he and Mike Irvin, another employee of the center, were making administrative rounds at approximately 9:30 a.m. They entered Cottage 289 from the clinic entrance and proceeded to the residential area of the cottage through the dining room.

Kozich testified that he discovered a towel was jammed into a bedroom door of Cottage 289. He pushed the door open and found two residents, Kathy and Mary Jane. Kozich testified that he found Kathy lying in bed with a sheet pulled over her head, and Mary Jane on the floor.

Kathy was said to be active and has a visual impairment. There was testimony that Kathy wears a helmet to protect her head from injury as she frequently gets injured. She is said to feel along the wall as she walks. Kathy is approximately five feet four inches tall and weighs about ninety-five pounds.

Kozich called the operator and requested that the supervisor and the officer on duty be summoned. Sergeant Bledsoe and Supervisor Linda Payman arrived at Cottage 289. Idelia Trapp came out of the kitchen and was asked by Kozich if she was working by herself. Idelia stated that she was working with Linda Williams.

Williams came into the cottage at approximately 9:50 a.m. She testified that she was on a short break and had gone over to the next cottage. She further testified that she was taught by the former superintendent, Purcell Taylor, how to jam the doors with towels. She said that the towels do not fall off the doors when opened or when the doors automatically closed. She testified that on May 6, 1989, the towels were already on the doors when she started her shift. She admitted using towels in the doors to keep residents out of the rooms, as it is commonly practiced at the center.

Idelia Trapp testified that she was on duty with Williams on May 6, 1989, and that she was washing dishes when Kozich inquired of Williams. Trapp testified that the towels were in the doors when she and Williams started their shift on the morning in question. She further testified that Williams informed

her that she was going on break. She stated that supervisors are not informed of breaks. Trapp testified that Mary Jane, who was one of the residents found in the room, was strong and that she was one of the residents they try to keep out of the rooms, with little success. Kozich confirmed Trapp's testimony during cross-examination by stating that employees do not inform their supervisors when they go on break. He admitted that "[break] practices are nebulous" and that the center always has problems with employees' fifteen- and twenty-minute breaks.

Several employees testified that "toweling" doors was a common and known practice at the center. They testified that the towels are used primarily to prevent the residents from going into the rooms after the beds are made.

Helen Moore stated, via defendant's Exhibit K, that she had observed towels wedged on Cottage 289 doors since 1987. She further stated that after she became a supervisor, other supervisors told her that they do it to keep Mary Jane out of the bedrooms.

There was testimony that the doors to the bedrooms closed automatically, and that the placing of towels to keep the residents out of the bedrooms did not work for all the residents. Some residents, it was said, could only be slowed down by the process, but were never completely prevented from going into the bedrooms.

Both Trapp and defendant Williams testified that they did not restrain the two residents in their bedroom, and no one testified that he or she saw the two employees restrain the residents.

### III

Appellant's single assignment of error is as follows:

"Linda Williams' right to due process of law, as guaranteed by the United States and Ohio Constitutions, was denied when she was convicted of and sentenced for unlawful restraint on evidence which was insufficient as a matter of law."

Appellant Williams argues that the trial court erred by convicting her on evidence which was insufficient as a matter of law. She further contends that the state did not prove its case beyond a reasonable doubt because there was an equally supportive theory of innocence in the circumstantial evidence presented.

Appellant was convicted of unlawful restraint, in violation of R.C. 2905.03, which states that:

"(A) No person, without privilege to do so, shall knowingly restrain another of his liberty.

"(B) Whoever violates this section is guilty of unlawful restraint, a misdemeanor of the third degree."

The Legislative Service Commission ("LSC") analysis of Am.Sub.H.B. No. 511 (R.C. 2905.03) states:

"This section defines the most minor offense in the trilogy of offenses beginning with kidnapping, and provides criminal sanctions against conduct which would ordinarily amount to grounds for a civil action for false arrest or imprisonment."

The essence of the crime of unlawful restraint consists of depriving the victim of his or her liberty without lawful justification, which is the same definition of the tort of false imprisonment. *Brinkman v. Drolesbaugh* (1918), 97 Ohio St. 171, 119 N.E. 451. The tort requires some restraint of the person and that he be deprived of his liberty or compelled to remain where he does not wish to remain or go where he does not wish to go, and that person be restrained of his liberty without sufficient complaint or authority. *Collins v. Los Angeles Cty.* (1966), 241 Cal.App.2d 451, 50 Cal.Rptr. 586. Therefore, under R.C. 2905.03, whether the offense is treated as a tort or crime, the definition remains the same. See *Parrott v. Bank of Am. Natl. Trust & Savings Assn.* (1950), 97 Cal.App.2d 14, 217 P.2d 89.

A conviction under R.C. 2905.03 carries with it all the negative consequences of a criminal conviction. See *State v. Wilson* (1975), 41 Ohio St.2d 236, 238, 70 O.O.2d 431, 432, 325 N.E.2d 236, 238, Herbert, J., concurring. See, also, *State v. Berndt* (1987), 29 Ohio St.3d 3, 6, 29 OBR 173, 175, 504 N.E.2d 712, 714, Herbert R. Brown, J., dissenting. Therefore, before a defendant can be convicted of this offense, it must be shown that he acted wilfully, *i.e.*, intentionally as opposed to accidentally. *Feliciano v. Kreiger* (1977), 50 Ohio St.2d 69, 4 O.O.3d 158, 362 N.E.2d 646. See LSC analysis of Am.Sub.H.B. No. 511 (R.C. 2901.22). If defendant's conduct has not substantially interfered with another's liberty, the offense has not been committed. *Feliciano, supra; Mullins v. Rinks, Inc.* (1971), 27 Ohio App.2d 45, 56 O.O.2d 218, 272 N.E.2d 152. This means that minor restraints should be left to the civil courts for redress. See *State v. Robinson* (1979), 92 Wash.2d 357, 597 P.2d 892.

The state, in order to get a conviction for unlawful restraint, must prove beyond a reasonable doubt that the victim was deprived of his or her liberty. Arising out of this showing is a presumption that the restraint was unlawful. *Uebelacker v. Cincom Systems, Inc.* (1988), 48 Ohio App.3d 268, 275, 549 N.E.2d 1210, 1218. However, unlike the tort of false imprisonment, the state has the burden of showing that the defendant did not have legal

privilege for the restraint. See R.C. 2905.03. We hold that the state in the case *sub judice* has failed to prove that Kathy and Mary Jane were unlawfully restrained by Williams.

■ Since R.C. 2905.03 offers no guidelines of what constitutes unlawful restraint for the purpose of a criminal conviction and having found no guidelines from either the Ohio Supreme Court or any court in Ohio, we offer the following guidelines necessary for conviction of the crime of unlawful restraint:

(1) The defendant's act must be wilful.

(2) Defendant's conduct must substantially interfere with another person's liberty.[1]

(3) The victim knows of the restraint or is harmed as a result of the restraint.[2]

(4) The restraint is total.

(5) Defendant exercised any force, or express or implied threat of force including a reasonable apprehension of force.

(6) Defendant acted without legal justification.

■ Unlawful restraint like the tort of false imprisonment involves a mixed question of law and fact. It is a question of law as to what elements constitute unlawful restraint; and the question whether those elements existed to warrant a conviction under the law is for the trier of fact. *Uebelacker, supra; Bronaugh v. Harding Hosp., Inc.* (1967), 12 Ohio App.2d 110, 41 O.O.2d 185, 231 N.E.2d 487; *Hebrew v. Pulis* (1906), 73 N.J.L. 621, 64 A. 121; *Gunderson v. Struebing* (1905), 125 Wis. 173, 104 N.W. 149.

There was no direct evidence that Williams restrained the two residents. The state relied entirely on circumstantial evidence. * * *■

There is testimony that Mary Jane, one of the residents found in the room, was strong and that she could not be kept out of the rooms completely even when the doors were "toweled." This testimony was further confirmed by

---

1. "Substantial" is used as an adjective to mean a "real" or "material" interference with the liberty of another as contrasted with a petty annoyance, or a slight inconvenience, or an imaginary conflict. See *State v. Robinson, supra.*

2. See *Bailie v. Miami Valley Hosp.* (1966), 8 Ohio Misc. 193, 195, 37 O.O.2d 259, 260, 221 N.E.2d 217, 218, quoting 1 Restatement of the Law 2d, Torts (1965) 65, Section 42, and adding "submission to mere verbal direction unaccompanied by force or threat of any character cannot constitute detention of the person," *id.*

Trapp when she testified that she was not surprised that Mary Jane was found in the room by Kozich. There was no testimony to the contrary that Mary Jane opens the doors when toweled. It is, therefore, not inconceivable that the two residents locked themselves in the room by accident, especially since there was no testimony indicating that they were struggling to get out of the room when they were found. If the practice of toweling doors was to keep the residents out and prevent them from messing up the beds, the two residents were found in a room that was already made up, an indication that they could have gotten into the room by themselves. Second, Kathy, one of the residents who was found lying in her bed, was known to always go into her room and lie down, which further creates doubt that any force was used to keep Kathy in the room since she liked being in the room.

Williams and Trapp were responsible for the two residents. There was no evidence that Williams was solely responsible for the two residents. There was testimony that Trapp, and not Williams, fed one of the residents. Trapp was aware that Williams was on a short break. It, therefore, follows that if Williams was on a short break, Trapp was responsible for the two residents for the short period that Williams was unavailable. There was testimony that the short breaks were "troublesome," and supervisors were not told by employees when employees took short breaks. Kozich testified that the center does not have a policy on short breaks. Trapp testified as follows:

"Q. All right. But to the best of your knowledge, she didn't contact the supervisor prior to leaving the first time? Is that correct?

"A. No. You don't have to contact the supervisor when you leave.

"Q. I didn't ask you that. I just asked you whether she did or not."

And the following colloquy took place between the court and Kozich:

"THE COURT: Are there any written policies or procedures as far as how one takes breaks or lunches?

"THE WITNESS: As far as I know, it's just lunches. Breaks has [sic] always been kind of a problem.

"THE COURT: Okay. Practices are nebulous?

"THE WITNESS: A little bit. Notifying your supervisor if you have to leave the building. And then the supervisor will then give you permission, you know, to go attend to your problem or whatever you have to do.

"THE COURT: Well, if one was going to take a break on a normal day. I mean, separate from problems, going to get a cup of coffee, cigarette, whatever. Is there some set policy where that person has to tell somebody I'm going on break?

"THE WITNESS: Yeah, they have to inform the staff and, uh—

"THE COURT: Okay, when you say inform staff, who is informed?

"THE WITNESS: *The other staff member working would have to know that you're leaving.*"  (Emphasis added.)

The state argues that Trapp could not have restrained the residents because "it was not supported by the evidence adduced at trial."  We take this self-confession to mean that the state is admitting that it had no case against Trapp.  The same goes for Williams.  The state has not presented sufficient evidence to uphold a conviction against Williams.  The evidence presented was too speculative and full of doubts, and the trial court erred in convicting Williams under the circumstances.

■  The trial court concluded that Williams was guilty because her motive for restraining the residents was to make sure they did not mess up things while she was out on break.  Generally, restraint or detention, reasonable under the circumstances and in time and manner, imposed for the purpose of preventing another from inflicting personal injuries or interfering with or damaging real or personal property in one's lawful possession or custody, is not unlawful.  *Sindle v. New York City Transit Auth.* (1973), 33 N.Y.2d 293, 352 N.Y.S.2d 183, 307 N.E.2d 245.

Kathy was described as an active resident with a visual impairment.  There was testimony that she wears a helmet to protect her head because of the frequency of injuries that she inflicts on herself.  Mary Jane was characterized by center employees as being very active and often getting into the bedrooms after they were made up to mess things up.  We do not find it unreasonable under the circumstances for Williams or Trapp from preventing the two residents from injuring themselves or keeping them from damaging things entrusted into their custody, while Williams and Trapp were absent briefly from their posts.

■  Assuming *arguendo* that we subscribe to the trial court's conclusion, the same motive equally applies to Trapp and even more so.  As we stated *supra,* Trapp was aware that Williams was out on a short break, thereby making Trapp solely responsible for the two residents.  Trapp was washing dishes in the kitchen, and, in order to keep the residents from wandering away from her presence, could have restrained them.  After all, she did not see anything unusual about the residents being in the room when Kozich confronted her.  In the case *sub judice,* where two defendants with equally the same motives and similar circumstances were charged for unlawful restraint of another person, acquittal of a codefendant makes Williams' conviction erroneous.  This is not an issue of credibility, but of facts and circumstances.

* * * Appellant's sole assignment of error is sustained and the trial court's judgment is reversed.

*Judgment reversed.*

FRANCIS E. SWEENEY, P.J., concurs.

JAMES D. SWEENEY, J., concurs in judgment only.