[Cite as *Cleveland v. Watson*, 2020-Ohio-3284.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF CLEVELAND,                                  :

    Plaintiff-Appellee,                            :

                                    No. 108746

    v.                                             :

YANIQUE WATSON,                                     :

    Defendant-Appellant.                           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:**  June 11, 2020

---

Criminal Appeal from the Cleveland Municipal Court
Case No. 18CRB009083

---

### *Appearances:*

Barbara A. Langhenry, Cleveland Director of Law, and Karrie D. Howard, Chief Prosecuting Attorney, and Marco A. Tanudra and Alisa Boles, Assistant Prosecuting Attorneys, *for appellee.*

Milton A. Kramer Law Clinic, Andrew S. Pollis and Carmen P. Naso, Supervising Attorneys, and Joseph Shell, Certified Legal Intern, *for appellant.*

ON RECONSIDERATION[1]

MARY J. BOYLE, P.J.:

**{¶ 1}** Defendant-appellant, Yanique Watson, appeals her convictions for domestic violence and unlawful restraint. She raises two assignments of error for our review:

> 1. The appellant received ineffective assistance of counsel when trial counsel failed to file a [Crim.R. 29] motion for acquittal after the prosecution presented insufficient evidence to prove all elements of the charges brought.
>
> 2. The convictions were against the manifest weight of the evidence.

**{¶ 2}** After thoroughly reviewing Watson's assigned errors, the record, and applicable law, we find merit in part to Watson's first assignment of error. Specifically, we find that the city failed to present sufficient evidence that Watson committed unlawful restraint, but find that it did present sufficient evidence of domestic violence. We therefore sustain in part and overrule in part Watson's first assignment of error.

**{¶ 3}** We further find that Watson's domestic violence conviction was not against the manifest weight of the evidence and overrule her second assignment of error.

**{¶ 4}** We therefore vacate Watson's conviction for unlawful restraint but affirm her conviction for domestic violence. Therefore, the trial court's judgment is

---

[1] The original announcement of decision, *Cleveland v. Watson*, 8th Dist. Cuyahoga No. 108746, 2020-Ohio-2721, released April 30, 2020, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

affirmed in part, reversed in part, and remanded for the trial court to issue a new judgment reflecting that Watson's unlawful restraint conviction has been vacated.

## I. Procedural History and Factual Background

{¶ 5} In June 2018, Watson was charged with domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor, and unlawful restraint in violation of Cleveland Codified Ordinances ("C.C.O.") 621.08(a), a third-degree misdemeanor. She pleaded not guilty to the charges, and the case proceeded to a bench trial in August 2018.

{¶ 6} M.D. testified that in June 2018, she was living with Watson in an apartment in Cleveland. She said that on June 9, 2018, she and Watson got into an argument. M.D. said the argument started in the kitchen and then moved to the bedroom. M.D. said that when they were arguing in the bedroom, Watson "pulled [her] hair and drag[ged] her." M.D. explained that Watson did not "drag[] [her] across the room," but Watson "grabbed [her] weave" and was "swinging [her] back and forth by [her] hair." M.D. said it hurt when Watson did this. M.D. explained that she is 5' 4½" tall and that Watson is 6' 2".

{¶ 7} M.D. stated that she ran to the bathroom to get away from Watson. She said that she was going to take a shower but was not able to because Watson "was banging on the door" trying to get in the bathroom. M.D. explained that as she was leaning against the door from the inside trying to keep Watson from getting in the bathroom, Watson was pushing against the bathroom door from the outside

trying to get in. M.D. said that she was not sure if Watson would get in the bathroom because Watson was "kind of strong."

{¶ 8} M.D. stated that she did not know how long she was in the bathroom (but on cross-examination, she said a "few hours"). M.D. said that eventually, Watson and Watson's friend, Glenn Williams, "broke down" the bathroom door and broke the door off of its hinges. M.D. testified that the door was "cracked from the pushing — them pushing it and me pushing back." M.D. identified photos of the broken door and the broken hinge.

{¶ 9} M.D. said that when the door came off of the hinges, Watson "poked [her] with the scissors" through a small hole by the broken hinge. The scissors were "craft scissors." When asked if she received any injuries from Watson "poking" her with the scissors, M.D. stated that she had a "little puncture" or "little scratch" that she showed to the police officers. M.D. said that after Watson "poked" her with the scissors, Williams told Watson to go into the bedroom so that M.D. could leave. M.D. left the apartment, went to her friend's house around the corner, and called 911.

{¶ 10} The city played a recording of footage taken from a responding police officer's body camera, which M.D. testified was a true and accurate reflection of what occurred that evening. M.D. told the officers when they arrived that her girlfriend (Watson) was in the house and was trying to stab her with scissors. M.D. stated that the scissors did not cut her skin but that she had a scratch from it. She showed the officers a small visible mark on her skin on the side of her torso just above her

waistline.[2]  M.D. said that she felt Watson "was trying to stab" her because Watson said that she was going to kill her.  M.D. also told the officers that Watson "pulled [her] hair and was spinning [her] around."

{¶ 11}  On cross-examination, M.D. agreed that when she and Watson were in the kitchen, M.D. was cleaning a small grill and dropped it, but she denied that she threw it on the floor.  M.D. further admitted that she followed Watson to the bedroom when they were arguing.  M.D. stated that she did so because she planned to take a shower.  But M.D. said that when they got to the bedroom, they began a different argument because Watson believed M.D. was "still having contact" with another female.

{¶ 12}  The city rested after M.D. testified.

{¶ 13}  Glenn Williams testified for Watson.  Williams stated that he and Watson worked together, and he had known Watson for over one year.  Williams said that on January 9, 2018, he had been at Watson's apartment "throughout the day," but left to get some dinner.  Williams could tell that there had been "heat" between Watson and M.D. that day.  Williams said that it appeared as if Watson just wanted to relax and "hang out" with Williams and his girlfriend, but M.D. kept wanting to "speak on whatever the situation was."  Williams and his girlfriend decided to "go grab dinner" because Watson and M.D. were talking.  Williams said

---

[2] Although there does appear to be a small, visible mark on M.D.'s side when she lifted her shirt for the officers to see, it was dark outside and difficult to see.  The city did did not submit any photos of the mark into evidence.  Later in the video, however, one of the officers tells Watson that he saw "marks" on M.D.

they were only gone for about 15 minutes. Williams testified that when they came back, everything got "really heated."

{¶ 14} Williams testified that M.D. "has a temper" and that he saw M.D. "doing a little push towards" Watson. He said that it was not too serious at first. He stated that Watson asked M.D. to leave. Williams testified that he kept trying to diffuse the situation. At one point, Williams said that M.D. punched a hole in the wall. He told Watson to walk away, so Watson went into the bathroom. According to Williams, Watson was in the bathroom with the door closed and M.D. kept pushing on the outside of the bathroom door to try to get in the bathroom. Williams said that it was M.D. who damaged the bathroom door. Williams stated that he was able to get M.D. to leave before the fighting escalated. He said M.D. left and "thought it was over," but then the cops came.

{¶ 15} On cross-examination, Williams denied that he lived with Watson and M.D. but agreed that he had been staying there for "about a month or so."

{¶ 16} The body-camera footage shows the officers interviewed Williams. Williams told the officers that M.D. came in the apartment and was being "violent." Williams told police that all Watson did was ask M.D. to leave. Williams also told the officers that Watson "did not touch [M.D.], she didn't go near [M.D.], [and] [M.D.] destroyed the house."

{¶ 17} Watson testified that on June 9, 2018, M.D. was upset with her all day because Watson wanted to stay in bed. Watson said that M.D. was slamming doors all morning to try to get Watson out of bed. When Watson got up, they argued in

the kitchen. Watson said that M.D. "picked the [George Foreman] grill up" and threw it on the ground. Watson then stated that M.D. picked the grill up, plugged it in, and threated to "electrocute" herself.

{¶ 18} According to Watson, she just wanted to "smoke a Mild" with Williams and his girlfriend and not argue with M.D. any longer. Watson said that she went into a different room with Williams and his girlfriend. Watson stated that M.D. was still yelling at her from the hallway. Watson said that M.D. opened the door and grabbed Watson's shirt and began to push Watson. When M.D. grabbed Watson's shirt, Watson said that she "yanked her off" so that M.D. would not touch her.

{¶ 19} Watson explained that she was mad at that point, so she went into the bathroom. Watson testified that M.D. tried to open the bathroom door but Watson "slammed the door closed." Watson further stated that M.D. was throwing herself at the door to try to open it. Watson said that she opened the door and M.D. "fell into the door." Watson testified that is when the door broke. Watson testified that at that point, she and M.D. were arguing in the hallway about "another girl."

{¶ 20} Watson stated that Williams was telling M.D. to stop fighting, but M.D. "kept trying to charge towards" Watson over Williams's back. Watson went into another room and shut the door. Watson said that M.D. "kept beating on the door," but then M.D. left. Watson opened the door, and Williams told her that M.D. had left the apartment. Watson denied that she pulled M.D.'s hair.

{¶ 21} On cross-examination, Watson stated that when she and M.D. were "arguing in the room," M.D. punched the wall. When shown a photo of a hole in the wall with M.D. standing next to the hole, Watson agreed that the hole was at M.D.'s eye level.

{¶ 22} On the body-camera footage, Watson told police that she had broken up with M.D., which made M.D. angry. Watson said that because of this, M.D. punched a hole in her wall, broke her bathroom door, and "destroyed" her apartment. Watson further stated to police that she went into the bathroom because she did not want to talk to M.D. and that M.D. kicked the bathroom door. Watson told police that she did not "put her hands" on M.D. Watson stated to police that she told M.D. to leave, and M.D. got mad and left.

{¶ 23} Watson told police that the apartment was hers but then admitted that M.D. was also on the lease. When police asked Watson why she did not call police, Watson replied, "Because she was going to call you anyway." Watson further told police that M.D. had two warrants out for her arrest, but police informed her that they "already ran [M.D.] in the car," and she did not have any warrants. Watson denied to police that she "put hands on" M.D.

{¶ 24} The trial court found that Williams was "not credible at all." The trial court stated that "[c]learly he has a vested interest, and his testimony represented that."

{¶ 25} The trial court further found that the photos that were admitted support M.D.'s version of events. She explained that the photo of the door hinge

shows that the nails were out, which supported M.D. testimony that Watson and Williams were trying to take the door apart. The trial court further found M.D.'s testimony that she was "in the bathroom trying to be safe without a phone" and that Watson "poked" her with scissors to be believable. Finally, the trial court found that based on M.D.'s small stature compared to Watson's 6' 2" size, M.D. would not "try to fight" Watson.

{¶ 26} The trial court sentenced Watson to 180 days in jail, suspending 165 of them, and two years of active probation. The trial court further ordered that Watson could become inactive after completing the DIET program, fifty hours of community service, and no contact with the victim while on probation.[3] It is from this judgment that Watson now appeals.

## II. Sufficiency of the Evidence

{¶ 27} In her first assignment of error, Watson argues that her trial counsel was ineffective because she did not move for a Crim.R. 29 acquittal at the close of the city's case. She maintains that if counsel would have, the trial court would have granted it because the city failed to present sufficient evidence to prove beyond a reasonable doubt that she committed domestic violence and unlawful restraint.

{¶ 28} To establish a claim of ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the deficient

---

[3] The record does not explain what the acronym DIET is, but according to the Cleveland Municipal Court's website, it stands for "Domestic Intervention, Education and Training Program." *See* https://clevelandmunicipalcourt.org/judicial-services/court-programs-services/diet (accessed Feb. 21, 2020).

performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 29} Failure to move for an acquittal under Crim.R. 29 is not ineffective assistance of counsel where the evidence in the city's case demonstrates that reasonable minds can reach different conclusions as to whether the elements of the charged offense have been proven beyond a reasonable doubt, and that such a motion would have been fruitless. *State v. Adams*, 1st Dist. Hamilton Nos. C-000388, C-000389, and C-000390, 2001 Ohio App. LEXIS 3737 (Aug. 24, 2001).

{¶ 30} The test an appellate court must apply in reviewing a challenge based on a denial of a motion for acquittal is the same as a challenge based on sufficiency of the evidence to support a conviction. *State v. Farraj*, 8th Dist. Cuyahoga No. 89543, 2008-Ohio-1084, ¶ 41, citing *State v. Bell*, 8th Dist. Cuyahoga No. 65356, 1994 Ohio App. LEXIS 2291 (May 26, 1994). In reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the city had proven the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "Reasonable

doubt" and "proof beyond a reasonable doubt" are defined in R.C. 2901.05(E) as follows:

> (E) "Reasonable doubt" is present when the [triers of fact], after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.

{¶ 31} Watson was convicted of misdemeanor domestic violence under R.C. 2919.25(A) and misdemeanor unlawful restraint under C.C.O. 621.08(a). Thus, we must determine if the state presented sufficient evidence under these statutory and code provisions.

{¶ 32} To prove beyond a reasonable doubt that Watson committed domestic violence and unlawful restraint, the city had to set forth evidence as to each element in the relevant domestic violence statute, R.C. 2919.25(A), and unlawful restraint under C.C.O. 621.08(a).

**A. Domestic Violence**

{¶ 33} R.C. 2919.25(A) provides that no person shall "knowingly cause or attempt to cause physical harm to a family member or household member." Thus, the city had to establish beyond a reasonable doubt that Watson knowingly caused or attempted to cause physical harm to M.D.

{¶ 34} Watson argues that the city failed to present sufficient evidence of domestic violence because pulling hair "extensions" does not amount to harm.

However, there is no requirement under R.C. 2919.25(A) that "physical harm" be of any certain duration or severity. R.C. 2901.01(A)(3) defines "physical harm to persons" to be "any injury, illness, or other physiological impairment, regardless of its gravity or duration." This court has held that "'[a] defendant may be found guilty of domestic violence even if the victim sustains only minor injuries[.]'" *Cleveland v. Amoroso*, 8th Dist. Cuyahoga No. 100983, 2015-Ohio-95, ¶ 31, quoting *State v. Blonski*, 125 Ohio App.3d 103, 114, 707 N.E.2d 1168 (9th Dist.1997). Any physical harm is sufficient. *Id.*

{¶ 35} After reviewing the evidence in this case, we find that the city presented sufficient evidence, if believed, of domestic violence. Although M.D. did not sustain any lasting or serious physical harm or injury, M.D. testified that Watson "grabbed [her] weave" and was "swinging [her] back and forth by [her] hair." M.D. said it "hurt" when Watson did this. Thus, this evidence is sufficient evidence of physical harm under R.C. 2901.01 and 2919.25(A).

{¶ 36} In support of her argument that there was not sufficient evidence, Watson cites to this court's decision in *State v. Davis*, 8th Dist. Cuyahoga No. 102726, 2016-Ohio-694, where we reversed the defendant's domestic violence conviction. Although we reversed the domestic violence conviction in *Davis*, there was not a majority opinion in the case. One judge concurred in judgment only with the lead opinion. The concurring-in-judgment-only opinion agreed to reverse the defendant's domestic violence conviction but did not agree with the reasoning set forth in the lead opinion. The third judge (who also happens to be the author of the

current case) dissented and would have found that there was sufficient evidence of domestic violence. Without a majority opinion in *Davis*, however, it has no precedential value, and Watson cannot rely on it.

{¶ 37} Watson further argues that her domestic violence conviction "lacks corroboration" because two other witnesses, herself and Williams, testified that it was M.D. who broke down the bathroom door and that Watson did not touch M.D. during the verbal argument. Corroboration, however, goes to credibility, which is a matter for manifest weight of the evidence, not sufficiency.

{¶ 38} Further, it is well established that a victim's testimony, alone, if found credible, can provide sufficient evidence to sustain a conviction. *See State v. Walburg*, 10th Dist. Franklin No. 10AP-1087, 2011-Ohio-4762, ¶ 19 (victim's testimony was sufficient to establish that she and defendant were cohabitating); *State v. W.J.*, 10th Dist. Franklin No. 14AP-457, 2015-Ohio-2353, ¶ 35, citing *State v. Timmons*, 10th Dist. Franklin No. 13AP-103, 2014-Ohio-3520 ("A victim's testimony is sufficient evidence to support sexual conduct by vaginal intercourse or fellatio."); *State v. Williams*, 8th Dist. Cuyahoga No. 57464, 1990 Ohio App. LEXIS 5221, 5 (Nov. 29, 1990) ("A victim's testimony, if believed, is sufficient to obtain and sustain a rape conviction.").

{¶ 39} Accordingly, we conclude that the city presented sufficient evidence that if believed, proved beyond a reasonable doubt that Watson committed domestic violence against M.D.

**B. Unlawful Restraint**

{¶ 40} C.C.O. 621.08(a) provides that "[n]o person, without privilege to do so, shall knowingly restrain another of his or her liberty." Thus, the city had to establish beyond a reasonable doubt that Watson knowingly restrained M.D.'s liberty without privilege to do so. The city argues that there were two instances of unlawful restraint: (1) when M.D. was restrained in the bathroom, and (2) when Watson swung M.D. around by her hair and dragged her by her hair.

{¶ 41} C.C.O. 621.08(a) is nearly identical to unlawful restraint under R.C. 2905.03(A). This court has held that to convict someone of unlawful restraint under R.C. 2905.03(A), the government must prove that: (1) the defendant's act was willful; (2) the defendant's conduct substantially interfered with another person's liberty; (3) the victim knows of the restraint or is harmed as a result of the restraint; (4) the restraint is total; (5) the defendant exercised any force, or express or implied threat of force including a reasonable apprehension of force; and (6) the defendant acted without legal justification. *State v. Williams*, 75 Ohio App.3d 293, 299, 599 N.E.2d 377 (8th Dist. 1991).

{¶ 42} We explained in *State v. Wright*, 8th Dist. Cuyahoga No. 92344, 2009-Ohio-5229, that "the element of 'restrain the liberty of the other person' to mean 'to limit one's freedom of movement in any fashion for any period of time.'" *Id.* at ¶ 23, quoting *State v. Wingfield*, 8th Dist. Cuyahoga No. 69229, 1996 Ohio App. LEXIS 867 (Mar. 7, 1996); *see also State v. Walker*, 9th Dist. Medina No. 2750-M, 1998 Ohio App. LEXIS 4067 (Sept. 2, 1998) (restraint of liberty does not require

prolonged detainment); *State v. Messineo*, 4th Dist. Athens Nos. 1488 and 1493, 1993 Ohio App. LEXIS 38 (Jan. 6, 1993) (grabbing victim's arm and shaking her constituted restraint).

**{¶ 43}** Generally, to restrain a person of his or her liberty means to limit or restrain the person's freedom of movement. *State v. Taylor*, 10th Dist. Franklin No. 14AP-254, 2015-Ohio-2490, ¶ 18; *see also Wingfield* at ¶ 6 (the element of restraint of liberty "means to limit one's freedom of movement in any fashion for any period of time"). "The restraint need not be for any specific duration or in any specific manner." *Taylor* at ¶ 18. The duration of the restraint does not have to be prolonged; momentary restraint is sufficient to qualify as restraint. *State v. Alghamdi*, 9th Dist. Summit No. 28837, 2018-Ohio-3158, ¶ 5; *State v. Young*, 10th Dist. Franklin No. 12AP-314, 2013-Ohio-1247, ¶ 19.

**{¶ 44}** Ohio law is clear that the restraint "does not depend on the manner in which an individual is restrained. * * * Rather, it depends on whether the restraint 'is such as to place the victim in the offender's power and beyond immediate help, even though temporarily.' * * * The restraint 'need not be actual confinement, but may be merely compelling the victim to stay where he [or she] is.'" *State v. Mosley*, 178 Ohio App.3d 631, 2008-Ohio-5483, 899 N.E.2d 1021, ¶ 20 (8th Dist.), quoting *State v. Wilson*, 10th Dist. Franklin No. 99AP-1259, 2000 Ohio App. LEXIS 5057 (Nov. 2, 2000).

**{¶ 45}** Watson maintains that "at no point" was M.D. trying to escape the bathroom, nor was she preventing M.D. from leaving the bathroom. Instead,

Watson claims that M.D. testified that she went into the bathroom willingly and that Watson was trying to get into the bathroom. We agree. M.D. never testified that she was trying to get out of bathroom and that Watson prevented her from doing so. M.D. said that she wanted to take a shower, but could not because Watson was trying to get in the bathroom. This is not unlawful restraint.

{¶ 46} After review, we find that the city failed to present sufficient evidence of unlawful restraint and vacate this conviction. Watson's first assignment of error is sustained in part with respect to unlawful restraint and overruled in part with respect to domestic violence.

## III. Manifest Weight of the Evidence

{¶ 47} In her second assignment of error, Watson contends that her convictions are against the manifest weight of the evidence. Because we agreed with Watson that the city failed to present sufficient evidence of unlawful restraint, we will address only her arguments regarding domestic violence. Watson argues that there was no corroborating evidence, either medical evidence or police testimony, to prove that she committed domestic violence. She maintains that the city did not present anything at trial to establish that M.D.'s version of the events "was true over" her version. We disagree.

{¶ 48} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained

by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶ 49} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶ 50} Watson contends that M.D. did not have any injuries. She states that even the body camera footage proved that M.D. did not have any injuries. Again, however, physical harm does not mean that a victim has to sustain serious injuries from the harm. *Amoroso*, 8th Dist. Cuyahoga No. 100983, 2015-Ohio-95, ¶ 31, citing *State v. Roberson*, 5th Dist. Stark No. 2012CA00215, 2013-Ohio-3449. Here, M.D. stated that Watson "hurt" her when she swung her around by her hair. Plus, although it is difficult to see a scratch on the side of M.D.'s torso in the video, M.D.

did pull up her shirt and show the officer where she said the mark was, and one of the officers later told Watson that he saw some "marks" on M.D.

{¶ 51} Further, the city submitted three photos into evidence. Two of the photos show damage to the bathroom door. The door's hinge was completely torn off with the screws coming out of the door frame. The door also had a huge crack in the middle of it. The third photo shows M.D. standing next to the wall with a hole in the wall. Watson claims that M.D. punched the wall, causing the hole. But the hole is eye level with M.D.'s eyes, which makes it more unlikely that she punched the wall hard enough to put the hole there. All three of these photos support M.D.'s version of events more than Watson's version. Due to Watson's much larger stature, it is more likely that Watson, not M.D., punched the wall that high and hard enough to put a hole in it. It also takes a lot of strength to break a door off of its hinges. Thus, it is more likely that Watson and Williams were pushing on the bathroom door together to break the door to get to M.D., rather than the other way around.

{¶ 52} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of the witnesses and determining whether the trial court clearly lost its way and created such a manifest miscarriage of justice such that Watson's domestic violence conviction must be reversed and a new trial ordered, we find that it did not. This is simply not the exceptional case where the evidence weighs heavily against the conviction.

{¶ 53} Watson's second assignment of error is overruled.

**{¶ 54}** Judgment affirmed in part, reversed in part, and remanded for the trial court to issue a new judgment reflecting that Watson's unlawful restraint conviction has been vacated.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MICHELLE J. SHEEHAN, J., CONCUR